**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES L. BOLDEN,

       Plaintiff - Appellant,

v.

CITY OF TOPEKA, KANSAS,

       Defendant - Appellee.

No. 04-3306

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**[*]
**(D.C. NO. 02-CV-2635-KHV)**

---

Bret D. Landrith, Law Offices of Bret D. Landrith, Esq., Topeka, Kansas, for the
Plaintiff - Appellant.

Sherri Price, Assistant City Attorney, City of Topeka, Topeka, Kansas, for the
Defendant - Appellee.

---

Before **LUCERO**, Circuit Judge, **BRORBY,** Senior Circuit Judge, and **HARTZ**,
Circuit Judge.

---

**HARTZ**, Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument.

James Bolden is not happy with the City of Topeka, Kansas, and several of its officials. The City demolished as nuisances two buildings he purchased at tax sales and then refused to extend his janitorial contract. After losing his attempt in state court to enjoin demolition of his buildings, he sought an injunction in federal court and eventually amended his federal complaint to include claims against the City and several individuals arising out of the demolitions and the termination of his janitorial contract. He alleged discrimination based on race (he is African-American) and as retaliation for protected speech, in violation of the Fair Housing Act and several civil-rights statutes. The federal district court dismissed the claims against the individual defendants because of untimely service. It granted partial summary judgment on some claims against the City under the *Rooker-Feldman* doctrine (which, in essence, forbids appeals from state-court judgments to federal district court, *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923); *D. C. Court of Appeals v. Feldman*, 460 U.S. 462, 486-87 (1983)), on the ground that those claims were "inextricably intertwined" with the state-court litigation he had lost; and it dismissed his racial-discrimination claim under 42 U.S.C. § 1981 on the ground that the statute creates no private right of action against state actors. Mr. Bolden's remaining claim—an allegation that his janitorial contract was terminated in retaliation for protected speech—went to the jury, which rendered a verdict for the City.

On appeal Mr. Bolden argues that the district court erred (1) in dismissing the § 1981 claim, (2) in applying the *Rooker-Feldman* doctrine, (3) in dismissing the individual defendants, (4) in denying his request for an extension of time to conduct discovery, and (5) in refusing to admit certain evidence at trial. He also claims that the magistrate judge assigned to his case was biased against his attorney. We have jurisdiction under 28 U.S.C. § 1291. We reverse the dismissal under *Rooker-Feldman* and the dismissal of the § 1981 claim, and remand for further proceedings on these dismissed claims. In all other respects we affirm the judgment below.

I.      FACTS AND PROCEDURAL HISTORY

Mr. Bolden purchased two houses, 1146 S.W. Washburn and 421 S.W. Tyler, at a sheriff's sale on August 29, 2001. Unbeknownst to him, however, on August 10 the City, after a hearing of which he had no notice, had ordered that the Washburn property be demolished within 30 days because it was unfit for human habitation and beyond repair. Mr. Bolden allegedly became aware of this when an employee with the City's Housing and Neighborhood Development Department (HND) told him that the property "was supposed to have been obtained by the city" and offered him $5,000 so that he would not "take a big loss," as the City was "going to tear it down." Aplt. App. at 54. Mr. Bolden

-3-

rejected this offer because the property had previously been appraised at $37,000, although he had paid only $1,900 for it.

At Mr. Bolden's request the City held another hearing concerning the property. On October 15, 2001, the hearing officer found that Mr. Bolden had failed to produce any evidence that he would be able to repair the properties and affirmed the order of August 10. Mr. Bolden then filed for an injunction in state court on November 9, 2001, to prevent the destruction of the property, asserting that the HND had promised him a development grant but was "not following its own rules." *Id.* at 176. He also claimed that HND's estimates of rehabilitation costs were too high, which caused him "delays and uncertainty in acquiring financing." *Id.*

Similar developments soon followed with respect to the Tyler property. On January 23, 2002, Mr. Bolden received notice that it was slated for demolition. An administrative hearing was held on March 18. Eight days later the hearing officer found that the Tyler property was unfit for human use and could not be repaired at a reasonable cost; it issued an order that the structures on the property be removed or demolished within 30 days. Mr. Bolden filed suit on April 19, 2002, to enjoin the destruction of the Tyler property. The state court consolidated the two injunction actions and held a hearing on October 30, 2002. Mr. Bolden was represented by counsel (not the attorney on this appeal).

A week later the court denied the requests for injunctions and ordered that the City could proceed with the demolitions on both properties, finding that neither could be renovated at a reasonable cost. The court also ruled that Mr. Bolden had failed to comply with HND's requirements for receiving funding. It found "no legal justification for the issuance of an injunction" and ruled that the City could proceed with the demolition of the structures on the two properties. *Id.* at 212.

Mr. Bolden filed a request for a new trial, which was denied. Now represented by Bret Landrith (the attorney who submitted the briefs for Mr. Bolden on this appeal), he filed a notice of appeal on December 18, 2002; but he then filed a motion to withdraw the appeal, and it was dismissed on May 5, 2003. Meanwhile, on November 21, 2002, the City had notified Mr. Bolden that his contract to provide janitorial services would lapse at the end of December.

On December 20, 2002, Mr. Bolden filed suit in the United States District Court for the District of Kansas against the City; Mayor Harry Felker; and two City employees, Jay Oyler and Mike McGee. The suit sought a temporary restraining order (TRO) "to prevent the imminent danger and irreparable harm including taking away his janitorial contract in retaliation for protected speech and the demolition of his real property in violation of his civil rights guaranteed under the Constitution of the United States and 42 U.S.C. §§ 1981, 1983 and

1985." *Id*. at 14. On February 4, 2003, the federal district court denied the request for a TRO and dismissed the complaint. The court held that (1) under the *Rooker-Feldman* doctrine it had no jurisdiction over Mr. Bolden's claims relating to the demolition of his properties because the claims were "inextricably intertwined" with the state court's decision that the City may proceed with demolition, and (2) Mr. Bolden had failed to allege sufficient facts to support federal jurisdiction on his contract claim. The district court did, however, grant Mr. Bolden leave to file an amended complaint.

The First Amended Complaint, filed on April 29, 2003, alleged that the City had terminated his janitorial contract in retaliation for his protected speech in state court, in violation of 42 U.S.C. §§ 1981 and 1983; and had denied him rehabilitation loans on account of his race, in violation of § 1981 and the Fair Housing Act, 42 U.S.C. § 3605 (FHA). It also alleged that the demolition of his properties (the structures on the Washburn property had been demolished on January 27 and those on the Tyler property had been demolished on February 12) had been unlawful in several respects: the use of funds from the United States Department of Housing and Urban Development (HUD) violated 42 U.S.C. § 1982, action under an unreasonable and discriminatory housing code violated § 1983, and failure to comply with HUD regulations violated § 1981. The amended complaint also alleged a variety of additional claims not at issue on this

appeal. And it added as defendants Kevin Rooney (an employee of HND), Meg Perry (allegedly the City Director of Code Compliance Services), Jeff White (interim director of HND), McPherson Construction (the contractor that the City had hired to demolish Mr. Bolden's properties), and HUD. It did not specify which defendants committed which actions, alleging only that the various wrongful acts were by "the defendants" and that "the defendants who are individuals . . . acted together to violate" Mr. Bolden's rights, in violation of 42 U.S.C. § 1985. Aplt. App. at 126.

The amended complaint sought a declaration that the City had enforced its housing regulations against him "so as to constitute an unconstitutional restraint on his freedom in violation of 42 U.S.C. § 1983," *id.* at 146; had demolished his houses "without probable cause, in violation of the Fourth and Fifth Amendments to the Constitution, and 42 U.S.C. §§ 1982, 1983," *id.* at 147; and had tortiously interfered with his janitorial contracting business. It also requested injunctive relief to prevent the defendants "from interfering in [Mr. Bolden's] bidding on federal and private janitorial contracts." *Id.* at 103.

On May 23, 2003, the City moved to dismiss all claims against it relating to the demolition of the structures or to the City's refusal to provide funding for repair of those structures. It argued that the claims were barred by the *Rooker-*

*Feldman* doctrine and precluded by res judicata because of the prior proceedings in state court. Four days later the City filed its answer to the amended complaint.

With leave of court Mr. Bolden filed his Second Amended Complaint on August 15, 2003. It removed McPherson Construction and HUD as defendants and sought damages and attorney fees for the first time. It continued to request injunctive relief (preventing the defendants from interfering with his bidding on janitorial contracts) and declaratory relief (that the defendants had wrongfully used federal funds to demolish his properties).

On February 2, 2004, the district court dismissed without prejudice the claims against the individual defendants because they had not been served in a timely manner. Shortly thereafter, on February 13, 2004, the district court granted the City's motion to dismiss under the *Rooker-Feldman* doctrine the claims arising out of the City's demolition of his properties and its refusal to provide funding to rehabilitate the properties.

Four days later the district court issued its Pretrial Order, which would "supersede all pleadings and control the subsequent course of this case." *Id*. at 887. The Pretrial Order left only two claims for disposition. Both related to the termination of Mr. Bolden's janitorial contract: a claim under § 1981 (alleging racial discrimination) and a claim under § 1983 (alleging retaliation for protected speech). Because this particular § 1981 claim had not been pleaded in the Second

Amended Complaint, the City objected to inclusion of the claim in the pretrial order. The district court overruled the objection. The City then moved for summary judgment on the two remaining claims.

On May 25 the district court granted the City's motion with respect to the § 1981 discrimination claim, holding that tort claims against state actors arising under § 1981 must be brought under § 1983. The remaining claim—that the City had violated § 1983 by terminating Mr. Bolden's janitorial contract in retaliation for his protected speech—was tried to a jury in July 2004. The jury returned a verdict in favor of the City.

## II. DISCUSSION

Mr. Bolden raises six contentions on appeal: (1) the district court erred in dismissing his § 1981 claim; (2) the district court erred in dismissing claims under the *Rooker-Feldman* doctrine; (3) the district court erred in dismissing the individual defendants from the case; (4) the district court erred in denying him an extension of time to complete discovery; (5) the district court erred in excluding certain evidence from the trial; and (6) he was harmed by bias directed against his counsel by the magistrate judge.

### A. § 1981

42 U.S.C. § 1981(a) states:

Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory

> to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Mr. Bolden claims that the City violated 42 U.S.C. § 1981 by cancelling his janitorial contract on the basis of race. The district court, relying on *Jett v. Dallas Independent School District*, 491 U.S. 701 (1981), dismissed the claim on the ground that "Section 1983 provides the exclusive remedy for damages against a state actor for claims which arise under Section 1981." Aplt. App. at 1161.

The district court accurately stated the law but, in our view, applied it with too heavy a hand. Apparently the § 1981 claim could have escaped dismissal if Mr. Bolden had merely added an allegation that he sought relief on the claim under § 1983. Dismissal on such a technical ground, without granting leave to amend, would rarely be appropriate. As we shall see, the thrust of *Jett* was not to impose a technical pleading requirement but to clarify that a § 1981 claim against a local government cannot be predicated on respondeat superior, a limitation imposed on § 1983 claims. We now proceed to analyze *Jett* and whether later legislation overruled its requirement that § 1981 claims for damages against municipalities be brought under § 1983. Determining that *Jett* is still good law, we then turn to whether dismissal of Mr. Bolden's § 1981 claim was therefore appropriate. We hold that it was not.

-10-

Norman Jett, a white male, was an employee of the Dallas Independent School District and the head football coach at South Oak Cliff High School, which had become predominantly African-American. After clashes with the principal, he was reassigned to another school. *See Jett*, 491 U.S. at 705-07. A few months later he resigned and filed suit against the school district and the South Oak principal. *See id.* at 707. He brought claims under 42 U.S.C. §§ 1981 and 1983 alleging that the school district had denied him due process when he was deprived of a constitutionally protected property interest in his coaching position; had violated the First Amendment by retaliating against him for statements to the press regarding the school's sports program; and had violated the Equal Protection Clause and § 1981 by reassigning him on the basis of his race. *See id.* These claims were tried to a jury, which found for Mr. Jett on all claims. *See id.* The school district moved for judgment notwithstanding the verdict, arguing that there could be no liability because "there was no showing that [Jett's] injuries were sustained pursuant to a policy or custom of the school district." *Id.* at 708. The district court rejected this argument, holding that Jett's racial-discrimination claim "was cognizable under § 1981 as well as § 1983, and . . . that liability is permitted on solely a basis of *respondeat superior* when the claim is one of racial discrimination under § 1981." *Id.* (internal quotation marks omitted).

On appeal the Fifth Circuit "rejected the District Court's conclusion that the [school district's] liability for [the principal's] actions could be predicated on a theory of *respondeat superior* under § 1981," noting that the Supreme Court in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), had held that "Congress did not intend municipalities to be subject to vicarious liability for the . . . violations of their employees." *Jett*, 491 U.S. at 710. In rejecting a suggestion for rehearing en banc, the court issued a second opinion, again holding that "*respondeat superior* liability against local governmental entities was unavailable under § 1981." *Id.*

The Supreme Court granted certiorari. It stated that the two questions before it were "whether 42 U.S.C. § 1981 [which at the time was identical to the present § 1981(a)] provides an independent federal cause of action for damages against local governmental officials, and whether that cause of action is broader than the damages remedy available under 42 U.S.C. § 1983, such that a municipality may be held liable for its employees' violations of § 1981 under a theory of *respondeat superior*." *Id.* at 705. Although noting that it had previously recognized an implied damages remedy for violations of § 1981 by private actors, *see id.* at 731, the Court refused to extend that remedy to encompass claims against state actors, such as municipalities. Examining the legislative history of §§ 1981, 1983, and 1988, four members of the Court

determined that the remedy provided by § 1983 was intended to be the sole remedy for civil-rights violations by state actors. *See id.* at 733-36. They said "that the express 'action at law' provided by § 1983 for the 'deprivations of any rights, privileges, or immunities secured by the Constitution and laws' provides the exclusive federal damages remedy for the violation of the rights guaranteed by §1981 when the claim is pressed against a state actor." *Id.* at 735. Justice Scalia, the essential fifth vote on the merits, arrived at the same result without reference to legislative history. *See id.* at 738-39.

As a result, Mr. Jett's § 1981 claim against the school district was restricted by the doctrines limiting § 1983 claims. In particular, the district could not be liable under respondeat superior. *See id.* at 736-37. The district could, however, be liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. The Court remanded the case to the circuit court to determine whether Jett still had a claim against the school district.

Thus, under *Jett*, Mr. Bolden could bring his § 1981 claim only under § 1983. Courts have divided, however, over whether *Jett* is still good law. Some contend that *Jett* was overruled by an amendment to § 1981 in the Civil Rights

Act of 1991. Under that amendment the former § 1981 became § 1981(a), and subsections (b) and (c) were added. The new subsections state:

> (b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> (c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The Ninth Circuit in *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir. 1996), held that the amendment overruled *Jett*. While conceding that the express language of subsection (c) "does not, in so many words, authorize a private cause of action against municipalities," it found such a cause of action "implicit in the new § 1981(c)." *Id.* at 1210. Looking to the legislative history of the 1991 Act, it referred to two House Committee reports: A report by the House Education and Labor Committee said that subsection (c) "confirms section 1981's coverage of both public and private sector employment. *See Runyon v. McCrary*, 427 U.S. 160 (1976)." H.R. Rep. No. 102-40(I) at 92 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 630. And a report by the House Committee on the Judiciary said: "[Subsection (c)] is intended to codify *Runyon v. McCrary*. In *Runyon*, the court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. The Committee

-14-

intends to prohibit racial discrimination in all contracts, both public and private." H.R. Rep. No. 102-40(II) at 37 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 731. The court concluded that implying a private right of action against municipalities under § 1981 "advances Congress's general purpose of remedying civil rights violations and its particular purpose in enacting § 1981(c): ensuring that the well-established rights contained in the statute are guaranteed against both private parties and state actors." *Id.* at 1214. Also persuasive to the court was that there is "no alternative enforcement mechanism in the revised 42 U.S.C. § 1981" and that allowing plaintiffs to bring a cause of action against municipalities to enforce § 1981 rights using § 1981 instead of § 1983 "imposes no substantive change on federal civil rights law." *Id.* The court stated: "We infer from § 1981(c)'s identical treatment of private entities and governmental entities that § 1981(c) permits both an implied cause of action against private defendants and an implied cause of action against government defendants." *Id.* at 1213. (The court also ruled, however, that § 1981 did not permit respondeat superior liability for state actors. *Id.* at 1214-15.)

The Eleventh Circuit disagreed in *Butts v. County of Volusia*, 222 F.3d 891 (11th Cir. 2000). The court reviewed the holding of *Jett* and the legislative history of the 1991 Act, finding "[n]othing in the 1991 amendment to § 1981 [that] evinces Congress' desire to alter the Supreme Court's conclusion in *Jett*."

*Id.* at 894. Although "[t]he express language of subsection (c) states that § 1981 protects against racial discrimination by private *and* state actors," 1981(c) still did not provide for a private right of action. *Id.* (emphasis added). The court emphasized that Congress "did [not] even mention the Supreme Court's opinion in *Jett*," *id.,* and stated that "Congress added subsection (c) to codify the Supreme Court's decision in *Runyon*." *Id*.

The Fifth Circuit has agreed with this reasoning. *See Oden v. Oktibbeha County*, 246 F.3d 458, 463-64 (5th Cir. 2001) (no need to imply cause of action against state actors under § 1981 when the 1991 Act did not provide one and one already exists under § 1983); *see also Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (in suit against state actor, § 1983 is exclusive federal remedy for violations of § 1981).

We also agree with *Butts*. Congress does not overrule recent Supreme Court precedent so subtly. The amendments to § 1981 do not expressly provide a private cause of action, as one would expect if Congress intended to set aside *Jett*. The language of subsection (c) reaffirms the Supreme Court's holding in *Runyon;* it hardly confronts the holding in *Jett*. And only one who never relies on committee reports would fail to be impressed by the total absence in the committee reports of any mention of *Jett* and the language in both that the subsection was intended to codify *Runyon*. We therefore conclude that even after

the 1991 amendments to § 1981, damages claims against state actors for § 1981 violations must be brought under § 1983.

We now apply *Jett* to this case. Mr. Bolden contends that he brought his § 1981 claims against the City under § 1983. His contention is far from frivolous. In his Second Amended Complaint his claim under § 1983 (Count 3) incorporates by reference all his preceding allegations, which include those in his § 1981 claim (Count 1). A complication arises in that his § 1981 claim concerning the janitorial contract first appears in the pretrial order, in which no mention is made that the § 1981 claim is being brought under § 1983. But one could infer that, as in his complaint, the § 1983 claim incorporates his § 1981 claim; and, indeed, Mr. Bolden argued to the district court that his § 1981 claim had been incorporated into his § 1983 claim. The City disputed the argument, and the district court did not specifically address it.

In any event, even if Mr. Bolden had not been sufficiently clear about bringing the § 1981 claim under § 1983, the district court should have permitted him to amend his complaint to do so. *See Sims v. Unified Government of Wyandotte County*, 120 F. Supp.2d 938, 953 (D. Kan. 2000) (ruling that *Jett* remains good law, but granting leave to amend complaint "to clarify that [plaintiff] is pursuing her 42 U.S.C. § 1981 claims, to the extent that they allege municipal liability, solely through the remedies provided by 42 U.S.C. § 1983.");

*Stewart v. Bd. of Commr's for Shawnee County*, 216 F.R.D. 662, 663-667 (D.

Kan. 2003) (same). "[L]eave [to amend] shall be freely given when justice so

requires," *see* Fed. R. Civ. P. 15(a), and we see absolutely no unfair prejudice to

the City, or any other reason not to allow Mr. Bolden to amend his complaint.

Of course, if Mr. Bolden's § 1981 claim against the City rested solely on an

allegation of respondeat superior, then it would fail even if pleaded properly

under § 1983. *See Jett*, 491 U.S. at 736. But Mr. Bolden contends on appeal that

his § 1981 claim does not present a respondeat superior allegation and rests on

grounds permitted under *Monell*. *See Monell*, 436 U.S. at 694. His contention is

at least colorable and has not been addressed by the district court. We therefore

remand to that court for further proceedings on the § 1981 claim.

**B.      *Rooker-Feldman* and Claim Preclusion**

The district court dismissed under the *Rooker-Feldman* doctrine

Mr. Bolden's claims relating to the destruction of the structures on his properties

and the City's denial of rehabilitation loans. We disagree with the district court.

Mr. Bolden's federal suit did not seek to overturn the state-court judgment.

Indeed, the allegations underlying his federal-court claims are identical to what

they would have been had there been no state-court proceeding; none of his

claims rests on allegations that the state-court proceedings or judgment violated

federal law, or that the judgment itself inflicted an injury. We do agree, however,

with the district court's observation that "general confusion" surrounds the *Rooker-Feldman* doctrine and that many, including the City, fail to distinguish it properly from res judicata doctrine. Aplt. App. at 874. In perhaps a vain attempt to clarify the doctrine, we will discuss it at length. But first we summarize the district court's ruling and the arguments of the parties.

The district court correctly said that *Rooker-Feldman* "prevents a party from seeking what in substance would be appellate review of [a] state judgment in a United State district court, based on the . . . claim [that it] violates the loser's federal rights." Aplt. App. at 874. It then relied on a precedent of our court to state that the essential inquiry is whether

> "the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment. . . . In other words, we approach the question by asking whether the state-court judgment *caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks *redress*." . . . If the requested relief amounts to a challenge to the state court decision, or is inextricably intertwined with the state court judgment, the Court does not have jurisdiction.

*Id*. at 879 (quoting *Kenman Eng'g v. City of Union*, 314 F.3d 468, 476 (10th Cir. 2002)).

Turning to the case at hand, it found a number of claims to be barred by the doctrine. As to the claim in Count I that the City had violated the prohibition against racial discrimination in 42 U.S.C. § 1981 by denying Mr. Bolden rehabilitation loans, the district court recognized that the state court "did not hear

-19-

or decide this issue [but] found that [Mr. Bolden] had not complied with the requirements of [HND] for participation in relevant funding." *Id.* at 880. It also observed that Mr. Bolden had made "no effort to distinguish the subject matter of his Section 1981 claim from the subject matter of his funding claim in state court." *Id.* Because "[Mr. Bolden's] federal claim c[ould] succeed only to the extent that the state court wrongly decided that [he] did not qualify for funding," *id.* at 881, the district court decided that the state- and federal-court claims were either identical or inextricably intertwined, so *Rooker-Feldman* barred the federal claim.

For a similar reason the court dismissed the claim in Count II that the City had violated the provision against racial discrimination in 42 U.S.C. § 1982 by wrongfully demolishing the structures on his property; the Count III § 1983 claims that the City (1) had increased housing code standards to unreasonable levels and (2) had discriminatorily enforced those standards against Mr. Bolden; the Count IV § 1985 claim that the City had deprived him of the use and enjoyment of his property; and the Count V claims that the City had violated the FHA by denying him loans and demolishing his property.

Mr. Bolden contends that the district court improperly dismissed under the *Rooker-Feldman* doctrine his claims arising out of the destruction of his property and denial of the rehabilitation loan. He argues that "[t]he claims . . . [he] raised

in federal court were independent of the denial of injunctive relief he sought in state court and he neither sought to reverse the state court judgment or raised any grievance over the [state] Court's denial of injunctive relief." Aplt. Br. at 28. The City responds, using language more appropriate for analysis under res judicata than under *Rooker-Feldman*, that each of the federal claims at issue "was either raised or could have been raised by [Mr. Bolden] in the state court actions," Aplee. Br. at 16, and that he "was obligated to set forth any and all grounds to challenge the legality of [the administrative orders] in the state court actions," *id.* at 18.

We agree with Mr. Bolden. The *Rooker-Feldman* doctrine prohibits federal suits that amount to appeals of state-court judgments. When the state-court judgment is not itself at issue, the doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action. The doctrine that governs litigation of the same subject matter or the same issues is res judicata—specifically, claim preclusion and issue preclusion. Confusion on this matter is unsurprising, because whenever *Rooker-Feldman* bars a federal suit, the state suit must have concerned the same subject matter as the federal suit (after all, the federal suit is challenging the state judgment), a precondition for invocation of preclusion doctrine. But the distinction between *Rooker-Feldman* and res judicata must be preserved. We

-21-

proceed to provide our understanding of the *Rooker-Feldman* doctrine and how it applies to this case.

The *Rooker-Feldman* doctrine has its origin in *Rooker v. Fidelity Trust Co.*, 253 U.S. 413 (1923). Dora Rooker and others had suffered an adverse judgment in state court and had lost an appeal to the state supreme court. They then sought relief in federal district court, claiming that the judgment was void because it gave effect to a state statute that conflicted with several provisions of the federal constitution. The Supreme Court affirmed the district court's dismissal for lack of jurisdiction. The Court wrote: "Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of that character. To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original." *Id*. at 416 (internal citation omitted). In other words, the relief sought by the plaintiffs in federal district court—voiding a state-court judgment—was the exclusive province of the United States Supreme Court in the exercise of its appellate jurisdiction. For a district court to void a state-court judgment would be a usurpation of the authority of the Supreme Court.

The next case to address the doctrine was *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The plaintiffs in that case petitioned the District of Columbia Court of Appeals (the equivalent of a state's highest

court, *see* 28 U.S.C. § 1257(b) (treating District of Columbia Court of Appeals as a "highest court of a State" for purposes of Supreme Court certiorari review)) to waive a court rule requiring applicants to the District of Columbia bar to have graduated from an accredited law school. *See id.* at 466, 471. After the court denied their request for a waiver, plaintiffs filed suit in the United States District Court for the District of Columbia, challenging the D.C. court's refusal to admit them to the bar or let them at least take the bar examination. *See id.* at 468-70, 472-73. The district court dismissed the suits for lack of jurisdiction, the United States Court of Appeals for the District of Columbia Circuit reversed in part, and the United States Supreme Court granted certiorari.

The Supreme Court began by noting that *Rooker* precluded the district court from reviewing a final judicial determination of the D.C. court. "Review of such determinations can be obtained only in this Court. *See* 28 U.S.C. § 1257 [(establishing review by Supreme Court of final judgments of highest court of a state)]." *Id*. at 476. Thus, its initial inquiry was whether the proceedings in the D.C. court had been "judicial in nature." *Id.* The Court concluded that the proceedings had been both judicial and legislative in nature. In deciding against the petitions for waiver of the rule, the D.C. court had acted judicially, so that judgment could not be reviewed by the federal district court. *See id.* at 479-82. But in promulgating the rule itself, the Court held, the D.C. court had acted

-23-

legislatively and the rule therefore could be challenged in federal district court. *See id.* at 482-86. The Court then proceeded to examine to what extent the plaintiffs' claims constituted a request for review of the D.C. court judgment. It held that the allegations challenging the D.C. court's denials of waiver "are inextricably intertwined with the [D.C. court's] decisions, in judicial proceedings, to deny the [plaintiffs'] petitions [for waiver]. The District Court, therefore, does not have jurisdiction over these elements of the [plaintiffs'] complaints." *Id.* at 486-87. The district court did, however, have jurisdiction to hear the attack on the constitutionality of the rule requiring graduation from an accredited law school. *Id.*

Much of the confusion regarding the *Rooker-Feldman* doctrine has arisen from *Feldman*'s use of the term *inextricably intertwined*. The term appears twice in that opinion. The first appearance is in footnote 16, where the Court addresses the argument that a federal district court could hear a case that amounted to a challenge to a state-court judgment if the federal ground for the challenge had not been raised or addressed in the state-court proceedings. The argument rested on the observation that the Supreme Court could not review the state-court judgment on that federal ground because it had not been preserved below. The attraction of the argument is that the state-court loser is not totally deprived of a federal-court federal-law challenge to the state-court judgment. But a necessary premise of the

argument is that the federal district court is not engaged in *Rooker*-barred appellate review because it is not actually reviewing an issue decided by the state court (which was never presented with the issue). The Court rejected the premise, saying, "If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's [ruling] in a judicial proceeding . . . , then the district court is in essence being called upon to review the state-court decisions. This the district court may not do." *Id.* at 482 n.16. In other words, if favorable resolution of a claim would upset a judgment, the claim is *Rooker*-barred if it is "inextricably intertwined" with the judgment, even if the underlying issue was not raised or addressed in the state court that handed down the judgment.

*Feldman*'s other use of the term was in deciding which issues were barred and which could be pursued in federal district court. As previously noted, the Court ruled that the plaintiffs were barred from challenging the D.C. court's rejection of their waiver request, but they could pursue their challenge to the rule requiring graduation from an accredited law school. The Court wrote:

> [I]t is clear that [plaintiffs'] allegations that the District of Columbia
> Court of Appeals acted arbitrarily and capriciously in denying their
> petitions for waiver and that the court acted unreasonably and
> discriminatorily in denying their petitions in view of its former
> policy of granting waivers to graduates of unaccredited law schools
> required the District Court to review a final judicial decision of the
> highest court of a jurisdiction in a particular case. These allegations
> are *inextricably intertwined* with the District of Columbia Court of

-25-

Appeals' decisions, in judicial proceedings, to deny the [plaintiffs'] petitions. The District Court, therefore, does not have jurisdiction over these elements of the [plaintiffs'] complaints.

*Id.* at 486-87 (footnote omitted and emphasis added). Thus, all of the plaintiffs' claims challenging the denial of waiver (apparently even if not raised in their petitions for waiver) were "inextricably intertwined" with the D.C. court's decision and therefore barred. As for the challenge to the rule, the Court wrote:

The remaining allegations in the complaints, however, involve a general attack on the constitutionality of Rule 46I(b)(3). The [plaintiffs'] claims that the rule is unconstitutional because it creates an irrebuttable presumption that only graduates of accredited law schools are fit to practice law, discriminates against those who have obtained equivalent legal training by other means, and impermissibly delegates the District of Columbia Court of Appeals' power to regulate the bar to the American Bar Association, do not require review of a judicial decision in a particular case. The District Court, therefore, has subject-matter jurisdiction over these elements of the [plaintiffs'] complaints.

*Id.* at 487 (footnote omitted).

As we understand the Court's application of *inextricably intertwined*, the term is not being used to expand the scope of the *Rooker* bar beyond challenges to state-court judgments. Rather, the purpose of the term is to highlight that a challenge to a judgment is barred even if the claim forming the basis of the challenge was not raised in the state proceedings. Such a claim, despite not being specifically resolved by the judgment, is, for *Rooker* purposes, "inextricably intertwined" with the judgment. As stated by the Second Circuit in *Hoblock v.*

*Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005), "[T]he phrase 'inextricably intertwined' has no independent content," *id*. at 87, but merely "states a conclusion," *id*. at 86. "*Rooker-Feldman* bars a federal claim, whether or not raised in state court, that asserts injury based on a state judgment and seeks review and reversal of that judgment; such a claim is 'inextricably intertwined' with the state judgment." *Id*. at 86-87. Thus, it was unnecessary for the *Feldman* court to discuss whether the challenge to the accredited-law-school rule was inextricably intertwined with the D.C. court's judgments denying waiver, because the challenge to the rule itself was not a challenge to the judgment (even though overturning the rule would undermine the D.C. court's waiver ruling by mooting the denial of the waiver, since a waiver would no longer be necessary).

Although holding that *Rooker* did not forbid the plaintiffs from maintaining claims that the rule itself was unconstitutional, the Court left it to the district court on remand to decide whether the doctrine of res judicata precluded those claims. *See id.* This brings us to the third, and very recent, Supreme Court opinion on the *Rooker-Feldman* doctrine, which expanded on the relationship between the doctrine and res judicata.

*ExxonMobil Corp. v. Saudi Basic Industries Corp.*, 125 S. Ct. 1517 (2005), involved a dispute over royalties between plaintiff Saudi Basic Industries Corp. (SABIC) and defendants, two subsidiaries of ExxonMobil (ExxonMobil). *See id.*

-27-

at 1524-25. SABIC sued ExxonMobil in Delaware state court, and ExxonMobil responded by countersuing in the United States District Court for the District of New Jersey. SABIC moved to dismiss the federal-court action on the ground of sovereign immunity. *See id.* at 1525. The district court denied the motion to dismiss, and SABIC filed an interlocutory appeal. While the appeal was pending, the state-court trial resulted in a verdict for ExxonMobil. *See id.* The Third Circuit sua sponte questioned whether *Rooker-Feldman* barred the federal court from exercising jurisdiction after the state court had entered judgment on the jury verdict. *See id.* ExxonMobil argued that the doctrine did not apply because it had filed its federal complaint before the state-court judgment had been entered. The Third Circuit rejected this argument, saying that the "only relevant consideration" was "whether the state court judgment precedes a federal judgment on the same claims." *Id.* (internal quotation marks omitted). "Once ExxonMobil's claims had been litigated to a judgment in state court, the Court of Appeals held, *Rooker-Feldman* precluded the federal district court from proceeding." *Id.* at 1526 (internal quotation marks and brackets omitted). ExxonMobil had, in fact, won in state court, but if it were to lose in the state appeal, the Third Circuit held, it would then be using the federal action to "invalidate" the state-court judgment—the "very situation . . . contemplated by *Rooker-Feldman's* inextricably intertwined bar." *Id.* (internal quotation marks omitted).

The Supreme Court reversed. It began its analysis by noting that lower courts had extended the *Rooker-Feldman* doctrine "far beyond the contours of the *Rooker* and *Feldman* cases," *id.* at 1521, and that the doctrine applied only in "limited circumstances," *id.* at 1526. In both *Rooker* and *Feldman* "the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment. Plaintiffs in both cases . . . called upon the District Court to overturn an injurious state-court judgment." *Id.* In this case, however, there was "parallel state and federal litigation." *Id.* The Court held that in such a situation "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Id.* at 1526-27 (internal quotation marks omitted). "[N]either *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court." *Id.* at 1527. If judgment is entered in the state-court action, "a federal court may be bound to recognize the claim- and issue-preclusive effects" of the judgment, "but federal jurisdiction . . . does not terminate automatically." *Id.* The case therefore was "surely . . . not the paradigm situation in which *Rooker-Feldman* precludes a federal court from proceeding. ExxonMobil plainly has not repaired to federal court to undo the

Delaware judgment in its favor." *Id.* (internal citation and quotation marks omitted).

In sum, the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 1521-22. The doctrine "does not otherwise override or supplant preclusion doctrine." *Id.* at 1522. In particular, the statute granting the Supreme Court appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, *albeit one that denies a legal conclusion that a state court has reached* in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id*. at 1527 (emphasis added; internal quotation marks, brackets, and ellipses omitted). This last statement undermines the district court's ruling in this case that *Rooker-Feldman* barred certain of Mr. Bolden's claims because they "could succeed only to the extent that the state court wrongly decided that [he] did not qualify for funding." Aplt. App. at 881. Appellate review—the type of judicial action barred

by *Rooker-Feldman*—consists of a review of the proceedings already conducted by the "lower" tribunal to determine whether it reached its result in accordance with law. When, in contrast, the second court tries a matter anew and reaches a conclusion contrary to a judgment by the first court, without concerning itself with the bona fides of the prior judgment (which may or may not have been a lawful judgment under the evidence and argument presented to the first court), it is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment. In this latter situation the conflict between the two judgments is to be resolved under preclusion doctrine, not *Rooker-Feldman*.

There is, however, a potentially confusing gloss on the *Rooker-Feldman* doctrine. The gloss appears in an invocation of *Rooker-Feldman* in *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 622-23 (1989). *ExxonMobil* addresses *ASARCO* in the following footnote:

> Respondent Saudi Basic Industries Corp. urges that *ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989), expanded *Rooker-Feldman*'s jurisdictional bar to include federal actions that simply raise claims previously litigated in state court. Brief for Respondent 20-22. This is not so. In *ASARCO*, the petitioners (defendants below in the state-court action) sought review in this Court of the Arizona Supreme Court's invalidation of a state statute governing mineral leases on state lands. 490 U.S., at 610. This Court dismissed the suggestion of the United States that the petitioners should have pursued their claim as a new action in federal district court. Such an

-31-

> action, we said, 'in essence, would be an attempt to obtain direct review of the Arizona Supreme Court's decision in the lower federal courts' in contravention of 28 U.S.C. § 1257, 490 U.S., at 622-623. The injury of which the petitioners (the losing parties in state court) could have complained in the hypothetical federal suit would have been caused by the state court's invalidation of their mineral leases, and the relief they would have sought would have been to undo the state court's invalidation of the statute. The hypothetical suit in *ASARCO*, therefore, shares the characteristics of the suits in *Rooker* and *Feldman, i.e.*, loser in state court invites federal district court to overturn state-court judgments.

*ExxonMobil,* 125 S. Ct. at 1524 n.2. At first blush, this language may seem hard to reconcile with the general proposition that *Rooker-Feldman* does not bar a federal-court suit raising a claim previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply contradict, the state-court judgment. One would think that the doctrine barring the federal-court claim in *ASARCO* would be res judicata, not *Rooker-Feldman*.

A close examination of *ASARCO*, however, reveals what was at stake in that case. Some taxpayers and a teachers association had sued in state court to obtain a declaration that a state statute governing mineral leases on state land violated the New Mexico-Arizona Enabling Act. The Arizona Supreme Court agreed that the statute was invalid, and some mineral lessees filed a petition for certiorari in the United States Supreme Court. One issue before the Court was standing. The United States, as amicus curiae, argued that the case should be

-32-

dismissed because the original state-court plaintiffs would not have had standing to raise the same claims in federal court. The Court agreed that the plaintiffs would not have had standing, 490 U.S. at 612-17, but it ruled that the case was properly before the Court because the "parties first invoking the authority of the federal courts," the mineral lessees who petitioned for certiorari, had standing and presented "an actual case or controversy." *Id*. at 624.

*Rooker-Feldman* arose in the discussion of this issue as the Court addressed the United States' suggestion that it should "dismiss the case and leave the judgment below undisturbed," *id*. at 621, and that "the proper course for [the lessees] is to sue in federal court to readjudicate the very same issues that were determined in the state-court proceedings below," *id*. at 622. The Court rejected the suggestion. First, it noted its precedents suggesting that the Arizona Supreme Court decision on the federal-law issue might not have preclusive effect if that decision "were not subject to federal review." *Id*. ("The predominant interest promoted by this apparent exception to normal preclusion doctrine is to assure that the binding application of federal law is uniform and ultimately subject to control by this Court."). As a result, dismissal by the Supreme Court "would creat[e] a peculiar anomaly in the normal channels of appellate review." *Id*. at 622. A suit in federal district court to litigate the issue already decided by the Arizona Supreme Court "in essence would be an attempt to obtain direct review

of the Arizona Supreme Court's decision in the lower federal courts, and would represent a partial inroad on *Rooker-Feldman*'s construction of 28 U.S.C. § 1257." *Id*. at 622-23. Accordingly, dismissal by the Supreme Court "would be inappropriate." *Id*. at 623.

Thus, *ASARCO* was not a simple case of a federal-court suit for declaratory judgment following a state-court declaratory judgment on the same claim. The issue was which court—the Supreme Court or the federal district court—was the proper forum for the mineral lessees to pursue their challenge to the Arizona Supreme Court decision, when neither forum would be fettered by preclusion doctrine (so the federal district court would be acting in essentially the capacity of an appellate court). *Rooker-Feldman*, which held that § 1257 gives the Supreme Court exclusive jurisdiction to review state-court judgments, argued for Supreme Court review. The *ASARCO* gloss on *Rooker-Feldman* therefore has very limited, if any, sway. Indeed, now that *ASARCO* has been handed down, it is clear that the Supreme Court need not dismiss a petition from someone in the position of the lessees in *ASARCO*, so no "apparent exception to normal preclusion doctrine," *id*. at 622, could be invoked. Consequently, if parties like the lessees were now to bring a declaratory-judgment action in federal court after losing in the Arizona Supreme Court, they would almost certainly be barred by res

judicata, and the resulting constraint on the federal district court would render its authority very different from that of an appellate court.

Guided by *ExxonMobil*, we hold that *Rooker-Feldman* does not apply here. Mr. Bolden filed suit in federal district court claiming numerous civil-rights violations by the City and the individual defendants arising from the destruction of his buildings. He did not ask the district court to overturn the state-court judgment. Indeed, all the state-court judgment did was *permit* the City to demolish Mr. Bolden's buildings—it did not *require* their demolition. He can be content to let stand the state court's denial of his request for injunctive relief.

*Rooker-Feldman* does not bar federal-court claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment. A suit on such claims could not be characterized as an "appeal" of the state-court judgment, which is the core concern of *Rooker-Feldman*. To illustrate, say a father was deprived of custody of his child by a state-court judgment. If he files suit in federal court, seeking to invalidate the state-court judgment on the ground that the state-court proceedings deprived him of due process or that the judgment was otherwise contrary to federal law, his suit would be barred by *Rooker-Feldman*; the suit usurps the Supreme Court's exclusive appellate jurisdiction because it seeks to set aside the judgment based on a review of the prior proceedings. If,

however, the father simply brought suit in federal court seeking custody of his child, without raising any complaint about the state-court proceedings, *Rooker-Feldman* cannot be invoked; his federal claim would have been the same even in the absence of the state-court judgment. A myriad of doctrines, including res judicata, would almost certainly bar the suit. But because he is not seeking to overturn the state-court judgment, *Rooker-Feldman* is inapplicable, regardless of whether a favorable judgment in federal court would be inconsistent with that judgment and would "den[y] a legal conclusion that [the] state court has reached." *ExxonMobil*, 125 St. Ct. at 1527 (internal quotation marks omitted). Here, the allegations underlying Mr. Bolden's federal claim would be identical if there had been no state-court proceeding. He is not seeking "to undo the [state-court] judgment." *Id*.

To be sure, Mr. Bolden's federal claims may still be precluded under res judicata doctrine. But the City, although it argued preclusion below, did not raise the argument on appeal. We therefore must reverse the district court's dismissal of claims under *Rooker-Feldman* and remand to the district court for further proceedings.

### C. Dismissal of Individual Defendants

Mr. Bolden challenges the dismissal of the individual defendants for untimely service of the complaint. Federal Rule of Civil Procedure 4(m) states in relevant part:

> Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

The district court dismissed the claims without prejudice because service was not effected within 120 days. We review under an abuse-of-discretion standard the decision to dismiss a defendant for failure of proper service. *See Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003).

Mr. Bolden had summonses issued for the individual defendants on November 18, 2003. He then sent summonses via Federal Express to defendants White and Perry; personally served Rooney and now-former Mayor Felker; and left summonses for Oyler and McGee at their residences. November 18 was more than 120 days after each of these defendants had first been named in a complaint. The original complaint, which named Felker, Oyler, and McGee as defendants, had been filed on December 20, 2002; and the First Amended Complaint, which added Perry, Rooney, and White, had been filed on April 29, 2003.

-37-

The magistrate judge conducted a pretrial conference on November 20, 2003. At the beginning of the conference the judge inquired whether Mr. Bolden had ever had summonses issued or attempted to serve the individual defendants until two days before. Bret Landrith, Mr. Bolden's counsel, admitted that he had not requested summonses to be issued before November 18 and that he had never directly contacted any of the six individual defendants, nor had any of the individual defendants indicated to him that they were going to appear voluntarily in the case and waive service of process. He also admitted that he had not even known that he was supposed to serve the individual defendants. His argument seems to be that he had assumed that when the attorney for the City made an appearance, the attorney was also representing the individual defendants who were, after all, City employees.

Mr. Landrith also maintained that the case had been "transferred" from state court to federal court. Aplt. App. at 1680. The magistrate judge, questioning whether there had been a "transfer," asked whether Mr. Landrith had filed the case in federal court on Mr. Bolden's behalf. Mr. Landrith answered, "That is the procedure to transfer an issue here that we took." *Id*. at 1682. He added that he had abandoned the state appeal because he had "encountered problems" and that he had "made a motion to ask this Court to hold open that case so we could transfer those other issues here." *Id.* at 1683. The magistrate judge

concluded his questioning of Mr. Landrith on the subject by obtaining his confirmation that no court had entered a transfer order.

The magistrate judge then asked counsel for the City whether it had ever been served with process in the case. She answered that it had not but that it had been "sent a certified copy of the original injunction and just went ahead and submitted to the personal jurisdiction as far as the City." *Id*. at 1684. In response to another question, she stated that she was not appearing on behalf of the individual defendants.

The magistrate judge pronounced, "I'm more than a bit concerned, indeed perhaps to the point of perplexed about this litigation," *id*. at 1687, and then questioned Mr. Landrith pointedly about his experience and education, and whether his failure to meet his discovery and service obligations was due to his being overworked, severely ill, or the victim of some sort of natural disaster. The judge also spoke directly to Mr. Bolden, expressing concern that the representation he was receiving was inadequate, and suggesting that he consider representing himself. The judge even hinted that Mr. Bolden might want to consider filing malpractice charges against Mr. Landrith, stating, ". . . Mr. Bolden, you ought to be aware of the fact that . . . you would have certain remedies that you might want to discuss with another lawyer that you could exercise against Mr. Landrith . . . ." *Id*. at 1717.

The magistrate judge filed a report and recommendation on December 2, 2003, recommending that the individual defendants be dismissed from the case. The report pointed out that Mr. Bolden had not timely served the individual defendants, requested an extension of time, or shown good cause for failure to serve. The judge dismissed Mr. Landrith's argument that "Kansas statutes impute knowledge of lawsuits against municipalities to all employees of the municipality," because he was "aware of no authority for this proposition." *Id.* at 704. He further noted that it had become "apparent" that "Mr. Landrith simply does not grasp the concept that, although the claims raised in this lawsuit may be very similar to those raised in state court litigation involving some of the same parties, this federal action is a wholly separate case. Contrary to Mr. Landrith's position, this case was not 'transferred' from state court to federal court." *Id.* at 707-08 (footnote omitted). The report ended on this note:

> In closing, the undersigned wishes to express some words of caution to both [Mr. Bolden] and Mr. Landrith. This case has been handled in an extremely haphazard manner. The court is mindful of and sympathetic to [the fact that] no attorney other than Mr. Landrith was willing to take [Mr. Bolden's] case and that [Mr. Bolden] is therefore thankful for Mr. Landrith's loyalty. But [Mr. Bolden] would be prudent to bear in mind that loyalty and competence are different qualities. Stated more directly, the court is deeply troubled with Mr. Landrith's apparent incompetence. The pleadings he has filed . . . and his non-responsive, rambling, ill-informed legal arguments during the pretrial conference suggest that he is not conversant with even the most basic aspects of the Federal Rules of Civil Procedure. The court doubts that Mr. Landrith has any better grasp of the substantive law that applies to the case.

-40-

Based on what transpired at the pretrial conference, [Mr. Bolden] appears more articulate than Mr. Landrith. [Mr. Bolden] may be better served by representing himself without any attorney if indeed Mr. Landrith is the only attorney willing to take the case.

*Id*. at 710-11.

Mr. Bolden objected to the magistrate judge's report and recommendation on December 11, arguing that it was "a written manifestation of the [magistrate judge's] continuing bias" and mentioning the judge's supposed "inexperience or newness in office." *Id*. at 716. Mr. Bolden also argued that he had not served the individual defendants because the City had intimidated and harassed "housing related civil rights claims process servers" in the past in connection with other, unrelated cases. *Id*. at 731-34. On February 2, 2004, the district court overruled the objections, adopted the report and recommendation, and dismissed Mr. Bolden's claims against the individual defendants, finding that Mr. Bolden had failed to "timely serve the individual defendants, seek an extension of time for service, or show good cause for failure to obtain service," *id.* at 857, and ruling that his objections were "without merit," *id.* at 858.

On appeal Mr. Bolden does not dispute that he did not request that summonses be issued or attempt to serve them until November 18, 2003—some 11 months after filing the original complaint (which included defendants Felker, McGee, and Oyler) and nearly seven months after filing the First Amended

Complaint (which added Perry, Rooney, and White as defendants). Instead, he argues that the individual defendants "entered their appearance when the two City attorneys appeared" and thus waived any service requirement. Aplt. Br. at 40. He asserts that they appeared voluntarily "in the form of a response motion dated 2/20/2003 that did not object to personal jurisdiction." *Id.* at 41. But no citation to the record is given for such a document; and the only document in the record dated February 20, 2003, is the "Defendant City of Topeka's Response to Plaintiff's Motion for Extension of Time to Amend Complaint to Include Damages," which makes no reference whatsoever to the individual defendants, mentioning only "Defendant City of Topeka." Aplt. App. at 34. Mr. Bolden also repeats his allegation that "similar civil rights plaintiffs had their process servers harassed, intimidated, even stalked by city officials." Aplt. Br. at 43. But he fails to base any argument on that allegation or even cite to any record support for it. In any event, we have located in the record some affidavits he submitted in district court to support the allegation, and the support is so weak that it could hardly justify the failure to attempt service in this case. Accordingly, we reject these arguments.

Finally, we observe that Mr. Bolden cannot benefit from the fact that the dismissal of the individual defendants occurred less than 120 days after filing of the Second Amended Complaint, apparently the pleading he was attempting to

-42-

serve. Although Rule 4(m) might be read to permit service within 120 days of the most recently filed version of the complaint, we agree with the other authorities that have addressed the issue and refuse to so read Rule 4(m).

To be sure, the word *complaint* in the Rule 4(m) requirement that service be "made upon a defendant within 120 days after the filing of the complaint," cannot be restricted to only the original complaint. If it were, then a new party could not be added in an amended complaint filed more than 120 days after the original complaint, because the new party could not be served by the 120-day deadline. *See McGuckin v. United States*, 918 F.2d 811, 813 (9th Cir. 1990) (such an interpretation "would restrict the time available for adding defendants to within 120 days after commencement"); *City of Merced v. R.A. Fields*, 997 F. Supp. 1326, 1337-39 (E.D. Cal. 1998) (similar).

But the 120-day period provided by Rule 4(m) is not restarted by the filing of an amended complaint except as to those defendants newly added in the amended complaint. *See Carmona v. Ross*, 376 F.3d 829 (8th Cir. 2004); 4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1137, at 377 (3d ed. 2002); 1 James Wm. Moore et al., Moore's Federal Practice § 4.80 (3d ed. 1997). This construction of the rule prevents the plaintiff from repeatedly filing amended complaints "to extend the time for service indefinitely," *Del Raine v. Carlson*, 826 F.2d 698, 705 (7th Cir. 1987). In particular, if we read

Rule 4(m) to refer to the most recently filed version of the complaint, regardless of whether the defendant to be served was newly added, dilatory plaintiffs could evade the rule's time deadline by taking advantage of the opportunity under Fed. R. Civ. P. 15(a) to amend the complaint once as of right before a responsive pleading is served; a plaintiff who had never bothered to serve any defendant could avoid altogether the original 120-day deadline simply by filing an amended complaint when it felt like effecting service. Accordingly, we read "service . . . upon a defendant within 120 days after the filing of the complaint," Rule 4(m), to refer to filing of the first version of the complaint naming the particular defendant to be served.

### D.    Discovery Extension

Mr. Bolden contends that the district court erred in failing to grant him an extension of time for discovery. We review such a decision under an abuse-of-discretion standard. *See Soc'y of Loyds v. Reinhart*, 402 F.3d 982, 1001 (10th Cir. 2005). The magistrate judge entered a scheduling order on June 30, 2003, providing that "all discovery shall be commenced or *served in time to be completed by* October 31, 2003." Aplt. App. at 320 (emphasis added). The City sent Mr. Bolden its first set of interrogatories and requests for production of documents on August 4, 2003. When Mr. Bolden failed to respond on time, the City sent his counsel a letter on October 13, stating that if it did not receive a

response by October 15, it would file a motion to compel. On October 16 his counsel sent an e-mail asking the City to resend the requests because his client had "lost" them. *Id*. at 634. The City again sent the requests and on October 17 filed a motion to compel. On November 4, 2003, the magistrate judge granted the motion.

Mr. Bolden served the City with discovery requests on October 30, 2003—one day before the discovery deadline. A week later he sought a 30-day extension of time to prepare a pretrial order because he had not "prepare[d] discovery requests until after complying with Defendants' requests" and had not received the "documents and interrogatory answers requested of Defendants in order to adequately prepare a pretrial order." *Id.* at 637. On November 13 the magistrate judge entered an order denying the request. The order noted that the scheduling order had required all discovery requests "be served in time to be <u>completed</u> by **October 31, 2003**," *id.* at 654; Mr. Bolden had *served* his requests only one day before that deadline; and he had not responded to the City's discovery requests until well after his responses were due. The judge found unimpressive Mr. Bolden's argument that he needed the City's discovery responses to prepare the pretrial order because "due to their untimeliness, [Mr. Bolden's] discovery requests are null," *id.* at 655. The magistrate judge determined that Mr. Bolden had failed to "exercise[] even a modicum of

diligence" regarding discovery and had shown no good cause to extend the pretrial-order deadline. *Id*. at 655. The judge further advised that he was

> troubled by the rambling, disjointed, and convoluted nature of many of the pleadings filed on behalf of [Mr. Bolden] in this case . . . . The court therefore strongly encourages [Mr. Bolden] <u>and</u> his attorney to get organized immediately and to devote the attention and efforts necessary to properly prepare for the upcoming pretrial conference . . . .

*Id.* at 656.

That same day, Mr. Bolden filed two pleadings relating to discovery. First, he filed an objection to the magistrate judge's order, stating that the defendants were obstructing his ability to conduct discovery "through deliberate acts in violation of the Fourteenth Amendment," *id.* at 658, that defendants were intimidating potential witnesses, that the magistrate judge had consistently "deviat[ed] from the Federal Rules of Civil Procedure to negatively influence the plaintiff's good faith settlement efforts," *id.* at 659, and that the magistrate judge had been "dismissive" of Mr. Bolden's claims that defendants were depriving him of resources, *id.* The district court overruled the objection one week later, finding "no competent record evidence to support [Mr. Bolden's] conclusory accusations." *Id.* at 696.

Mr. Bolden's second pleading filed on November 13 was a motion to extend the time for discovery. He claimed that until he received the magistrate judge's report he had not known that serving discovery requests on October 30

violated the discovery deadline. He asserted that he "ha[d] diligently pursued discovery despite being injured by his opponents and prior rulings of this court," *id.* at 668, and that the magistrate judge had erred in stating that he had not responded to the City's discovery requests before being ordered to (he stated that he had responded on October 24, a week before the order was entered). He also argued that forbidding further discovery could enable the City to obtain a summary judgment when he had not had the opportunity to discover information necessary to oppose it. He contended that good cause for extending the deadline "ha[d] been shown in the actions of defendants and defense counsel to deprive [Mr. Bolden] of resources necessary to prosecute his case and to violate state and federal laws to intimidate [him] as a victim and witness and to intimidate the witness." *Id.*

The following day the magistrate judge denied the request to extend discovery, noting that Mr. Bolden had filed his request after the deadline had passed, in violation of D. Kan. Local Rule 6.1, and saying that he was "baffled" by Mr. Bolden's statement that he "had no reason to know . . . that an extension was required." *Id.* at 673 (internal quotation marks omitted). The judge decided that Mr. Bolden had shown neither good cause nor excusable neglect. Mr. Bolden filed an objection to the magistrate judge's order on November 26, stating that the defendants had continued to "deprive [him] of the resources to conduct

discovery" and tampered with witnesses, and arguing that the scheduling order

and proposed pretrial order "contemplate[d] the continuance of discovery until

just prior to trial." *Id.* at 698-99. The district court upheld the order on

December 8:

> The Court has reviewed plaintiff's incomprehensible objections,
> along with [the magistrate judge's] order. . . . Plaintiff cites no
> persuasive facts or law in support of his argument that he
> demonstrated good cause for an extension of the discovery deadline,
> or that some unspecified rule of civil procedure was improperly
> construed. The record suggests no reason why this Court should
> conclude that [the magistrate judge] abused his discretion, or that his
> ruling was clearly erroneous.

*Id.* at 714.

On appeal Mr. Bolden argues that he "did not have enough time to

complete discovery and even though the magistrate [judge] proposed a lengthy

extension of the summary judgment brief due date which was ordered by the

presiding judge date [sic] and voluntary discovery still continued no extension of

discovery was permitted Mr. Bolden." Aplt. Br. at 45-46. In support of his

argument that discovery should have been extended because the deadlines for

summary-judgment briefing were extended, he cites Federal Rule of Civil

Procedure 56(f), which provides:

> When Affidavits are Unavailable. Should it appear from the
> affidavits of a party opposing the motion [for summary judgment]
> that the party cannot for reasons stated present by affidavit facts
> essential to justify the party's opposition, the court may refuse the
> application for judgment or may order a continuance to permit

-48-

affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

We affirm the district court's ruling. Rule 56(f) grants discretion to the court to delay ruling on a motion for summary judgment. It does not compel the court to grant a continuance to a party that has been dilatory in conducting discovery. Mr. Bolden has offered no colorable reason why the discovery deadline should have been extended. The district court did not abuse its discretion in denying the extension.

### E.    Evidentiary Rulings

Mr. Bolden claims that during trial the district court "excluded evidence related to Bolden's experienced discrimination in housing and his application for federal funds that exhibited racial animus in city policies. From that information, a jury could have properly evaluated whether he was retaliated against for his speech in [state court]." Aplt. Br. at 46. He identifies no particular evidence and provides no citation to the record regarding any exclusion by the district court.

"A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected." Fed. R. App. P. 28(e). Mr. Bolden failed to include in his 1798-page appendix a transcript of the trial. Therefore we have no basis for evaluating this claim. "Where the record is insufficient to

permit review we must affirm." *Scott v. Hern*, 216 F.3d 897, 912 (10th Cir. 2000).

### F. Bias of Magistrate Judge

Finally, Mr. Bolden claims that he was harmed by bias directed at his counsel by the magistrate judge, accusing the magistrate judge of ignoring affidavits he had submitted, apparently as attachments to his brief in opposition to summary judgment, and of "us[ing] his office to secure the disbarment" of his counsel, Mr. Landrith, Aplt. Br. at 49. The allegation regarding disbarment apparently refers to testimony the magistrate judge gave in Mr. Landrith's January 20, 2005, disbarment proceeding, which occurred after the trial of this case. Mr. Bolden also mentions a "confidential decision" issued by "the chief judge of this circuit" on March 23, 2005, that found the magistrate judge to be biased. *Id.* at 48. Again, no citation to the record or any other evidence is provided to support this assertion. In any event, the magistrate judge's actions in this case do not indicate disqualifying bias.

"[J]udicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel" do not establish bias unless they "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555-56 (1994). "Ordinarily, when a judge's words or actions are motivated by events originating within the context of judicial proceedings, they are insulated from

charges of bias.  Thus, adverse rulings cannot in themselves form the appropriate grounds for disqualification." *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005) (internal citation and quotation marks omitted).

Here, the magistrate judge made some very disparaging remarks about Mr. Bolden's counsel during the hearing on the pretrial order, which we have quoted at length earlier in the opinion.  What is apparent, however, is not bias but frustration.  The magistrate judge was clearly concerned about Mr. Bolden's welfare, because his counsel was ill-serving him.  As the district court noted, the magistrate judge was "express[ing] well-taken concern about the quality of plaintiff's representation."  Aplt. App. at 857.  Judges must be very cautious about disparaging counsel; but we have no reason to believe that the magistrate judge was influenced in his rulings by personal animosity toward Mr. Bolden's attorney.

## V.    Conclusion

We REVERSE the dismissal under *Rooker-Feldman* of claims against the City and the dismissal of the § 1981 claim against the City and REMAND for further proceedings.  We AFFIRM the judgment of the district court in all other respects.