RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL J. ARENDALE,

        *Plaintiff-Appellant,*

    *v.*

CITY OF MEMPHIS,

        *Defendant-Appellee.*

No. 07-5230

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 05-02190—J. Daniel Breen, District Judge.

Argued and Submitted: January 29, 2008

Decided and Filed: March 20, 2008

Before: SILER, CLAY, and COOK, Circuit Judges.

---

### COUNSEL

**ARGUED:** Amber Isom-Thompson, KIESEWETTER, WISE, KAPLAN & PRATHER, Memphis, Tennessee, for Appellee. **ON BRIEF:** James Edward King, Jr., ESKINS KING, Memphis, Tennessee, for Appellant. Amber Isom-Thompson, Robert D. Meyers, KIESEWETTER, WISE, KAPLAN & PRATHER, Memphis, Tennessee, for Appellee.

    CLAY, J., delivered the opinion of the court, in which SILER, J., joined. COOK, J. (p. 18), delivered a separate opinion concurring in part and concurring in the judgment.

---

### OPINION

---

    CLAY, Circuit Judge. Plaintiff Michael Arendale is a white police officer employed by the Memphis Police Department. He appeals the district court's grant of summary judgment in favor of Defendant City of Memphis ("The City") in this civil rights suit brought under 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* For the reasons that follow, the district court's decision granting summary judgment in favor of the City is **AFFIRMED**.

### STATEMENT OF FACTS

    Plaintiff Michael Arendale is a self-described "White American citizen" who has been an officer with the Memphis Police Department ("MPD") since 1990. (J.A. 17–18) He alleges that he

was given less desirable assignments than his African-American colleagues, that ill-treatment of him by an African-American supervisor created a hostile work environment, that he was illegally suspended from work after an altercation with that same supervisor, and that he was retaliated against after he filed a charge with the EEOC.

In August 2002, after more than twelve years working in the MPD's North Precinct, Plaintiff sought a transfer to the Northeast Precinct, which he believed to be a "better work location" because "[t]he demographic area was a lot better." (J.A. 29, 49) Plaintiff was granted the transfer, and was assigned to the 7 a.m. to 3 p.m. shift. At the time relevant to this case, Plaintiff was supervised by Lieutenant Andre Cox, who is African-American. Also during this time, the Northeast Precinct's acting commander was Major Danny Cooper, and the Deputy Chief of the MPD was M.J. Wright. Both Major Cooper and Chief Wright are white.

## A. Arendale's Assignments

Upon arriving at the Northeast Precinct, Plaintiff's first assignment was the "extra board." Extra board officers do not have continuing responsibility for a specific geographic area or "ward," but instead are assigned to fill in for officers who call in sick or who are otherwise unable to patrol their assigned wards. Although Plaintiff admitted in a deposition that new officers in a precinct are typically assigned to the extra board so that they can "become familiar with the entire precinct," he also testified that he was assigned to the extra board for three months, which he believes is an "abnormally long amount of time" for a veteran officer to have this assignment. (J.A. 293, 295) According to testimony by Major Cooper, an officer's assignment to a ward or the extra board is normally determined by the officer's lieutenant, although the lieutenant's commander might occasionally intervene if the commander "saw a problem." (J.A. 432)

Plaintiff was eventually assigned to Ward 828, a ward he believes is "one of the better and less stressful wards in the Northeast Precinct." (Plaintiff's Br. at 4) On May 8, 2003, however, Plaintiff was reassigned to Ward 822.[1] According to Plaintiff, he was informed by Lieutenant Cox that the decision to reassign him came from a meeting of precinct command officers, and was made because they believed "crime was running rampant in 828 and [Plaintiff] wasn't doing anything to curtail it . . . ." (J.A. 304) This testimony was corroborated by that of Major Cooper, who said that he personally made the decision to move Plaintiff out of Ward 828 due to a large number of complaints from ward residents that the officers in that ward were not sufficiently attentive to their duties.

## B. Alleged Harassment

Plaintiff also alleges that various altercations between himself and Lieutenant Cox amounted to racially motivated harassment. According to Plaintiff, Lieutenant Cox would often call Plaintiff into his office and criticize him for incorrectly completing accident reports. Plaintiff testified that at least once a week, Cox would "berate me about my ability to write a report that I had been doing for 12, 13 years." (J.A. 63–64) Plaintiff also claimed that Cox treated other white officers in the same way, but that black officers did not receive this treatment. When asked how he knew that Cox's criticism was limited to white officers, however, Plaintiff admitted that it was "[j]ust my observation." (J.A. 64)

---

[1] In his brief, Plaintiff claims that Lieutenant Cox replaced him and his partner "with two African American rookie police officers . . . ." (Plaintiff's Br. 4) The only evidence in the record to support this claim, however, is the affidavit of Plaintiff's partner, Officer Jeff Chaudoin, who does state that Lieutenant Cox assigned three African-American officers to Ward 828, but not until several months after Plaintiff and Chaudoin were reassigned.

In his deposition, Lieutenant Cox testified that at the time he was working at the Northeast Precinct, the MPD had recently changed the format of its offense reports, and that "numerous officers" had problems complying with the new forms. (J.A. 86–87) Cox further testified that, to ensure compliance with federal reporting regulations, the MPD put pressure on lieutenants to ensure that the forms were completed correctly, and even threatened consequences to lieutenants whose subordinates did not comply. As a relatively junior lieutenant, Cox testified that he was particularly concerned that he could face disciplinary charges for non-compliance. Lieutenant Cox added that several officers, both white and African-American, had complained about his insistence that the reports be filled out correctly, and he named three black officers who had lodged such complaints. No testimony or other statements from these officers appear in the record.

In addition to his claims that Lieutenant Cox harassed him by criticizing his accident reports, Plaintiff also alleges that two additional incidents constituted racially motivated harassment. In June of 2003, Plaintiff claims, he was called into Cox's office and accused of leaving a crime scene unattended, when in fact it was a different officer who had left the crime scene.[2] Plaintiff admits, however, that after he told Lieutenant Cox that Cox was accusing the wrong officer, Cox eventually left the office, verified Plaintiff's statement and admitted that Plaintiff was correct. While Plaintiff adds that Cox then "just started on something else berating me and telling me I handled that all wrong," Plaintiff does not explain the subject of this new accusation. (J.A. 310)

Additionally, Plaintiff alleges he was harassed by Lieutenant Cox after an incident involving a different crime scene. According to Plaintiff, he and his partner arrived at the scene of an attempted aggravated robbery and discovered a knife which had been used in the crime. Both men stood by the knife to guard it. Although Cox said nothing to either officer upon his arrival at the crime scene, Plaintiff says that the next day Lieutenant Cox "began berating me about standing at the crime scene, looking at a knife and that [sic] it did not take two officers to watch the knife." (J.A. 775)

On February 4, 2004, Plaintiff was reassigned to the extra board. Shortly thereafter, on February 20, 2004, he filed a charge with the EEOC alleging both race and age discrimination against Lieutenant Cox.

### C.    Insubordination Charges

On April 15, 2004, Plaintiff was assigned to the front desk at the Northeast Precinct. As the desk officer, Plaintiff was required to follow a one page set of "desk procedures," which include a requirement that "officers working the desk . . . will be aware of who is at the location, whether it is visitors, or officers and will monitor any visitors and will not allow visitors in unauthorized areas." (J.A. 108) While at the desk, Plaintiff was approached by Charles Allred, who identified himself as a retired police officer and asked if he could look at some of the pictures on the precinct walls. In Plaintiff's own words, the following exchange then occurred:

> I caught some motion coming from my left side and I looked up and it was Lieutenant Cox coming. And he said in just a hostile manner, is that man down there with you? I said, no sir. He said, well, who is he? I said, he's a retired police officer, he's here to do a report and he asked if he could look at the pictures on the wall while I finished this report and I said okay. He said, has anybody ever told you about letting people go back there? I said, no, sir. I said he's a retired police officer. I said, you know, what's the big deal? [Lieutenant Cox said w]ell, I want you to write me a memo on what he is doing back there. Well, at that specific moment, that

---

[2]In an affidavit, Plaintiff alleges that the officer who actually left the crime scene is African-American. (J.A. 774)

was about the most ridiculous thing I have ever heard in my life, and I am on the phone trying to take a report. I said, Lieutenant Cox . . . I don't have time to write you a memo for that.

(J.A. 330–331)

Lieutenant Cox relieved Plaintiff of duty, and Plaintiff was eventually sent home. While there is some dispute as to whether Plaintiff was sent home because he lacked the required equipment to be reassigned to the field, or because Major Cooper observed Plaintiff and believed he was too visibly angry to be entrusted with police work, three facts about this incident are undisputed. First, Lieutenant Cox told Plaintiff to write a memo. Second, Plaintiff expressly refused to do so. Third, Plaintiff did not bring his pistol belt to work, a violation of MPD regulations.

Lieutenant Cox charged Plaintiff with insubordination for failing to comply with his instructions, and with neglect of duty for Plaintiff's failure to bring his pistol belt to work.[3] Under MPD regulations, an officer commits insubordination when they "display disrespect to, or disregard for, a supervisory member of this department, either on or off duty. This includes cases of verbal abuse, abruptness, or rudeness toward a superior or failure to promptly and courteously respond to suggestions, counseling, or disciplining of a superior officer." (J.A. 110) Lieutenant Cox alleged that Plaintiff committed insubordination when he failed to identify retired Officer Allred upon request by Cox, appeared unaware of Allred's location and was "asked several times about the individual [but] purposely ignored" these requests. (J.A. 109-110). Lieutenant Cox also charged that Plaintiff was insubordinate when he refused to write a memo as instructed.

## D.     Plaintiff's Discipline Hearing and Appeal

A discipline hearing was held before Major Cooper on June 28, 2004. During this hearing, Plaintiff alleged that Lieutenant Cox was "picking on him," and he brought up past incidents including the dispute over his ward assignments. (J.A. 114) Afterward, Major Cooper sustained the charge of insubordination, noting that he had personally observed Plaintiff immediately after the incident and that "his anger showed on his face and he was so upset that he was in no condition to work at the desk or in the field." (J.A. 113) Major Cooper also rejected the allegations that Lieutenant Cox was treating Plaintiff unfairly, adding that "some of the things that Officer Arendale was upset about, such as his car assignment, were administrative decisions or matter[s] of policy and [were] not because Lt. Cox was 'picking on him.'" (J.A. 114) Plaintiff was suspended from duty for eight days on the insubordination charge, and two days for neglect of duty.

Plaintiff appealed this suspension to Deputy Chief Wright, and an appeal hearing was held on September 17, 2004. During that hearing, Plaintiff admitted that he refused to write the memo as instructed by Lieutenant Cox. Nevertheless, Plaintiff's representative at the hearing argued that he deserved a shorter suspension because he had only been disciplined one other time by the MPD.[4] Chief Wright sustained both charges against Plaintiff, but reduced his overall suspension to four days and ordered him to attend anger management classes.

---

[3] Plaintiff concedes that he was required to wear his pistol belt while on duty, and does not contest this charge.

[4] The record is somewhat unclear on Plaintiff's prior disciplinary record. While his representative stated that Plaintiff had only one "sustained charge[]" prior to the incident with Lieutenant Cox, (J.A. 116,) Plaintiff testified in a deposition that he had previously received "a written reprimand and an oral reprimand." (J.A. 270) In his deposition testimony, however, Plaintiff only described in detail one disciplinary incident, which involved him accidentally discharging a shotgun while he was working on it in his office.

### E.      Procedural History

On April 21, 2004, Plaintiff filed another EEOC charge, claiming the April 15, 2004 incident was in retaliation for his previous EEOC complaint. This charge was amended on July 1, 2004 to include his suspension.

The instant case was filed in the Western District of Tennessee on March 10, 2005, alleging disparate treatment, hostile work environment and retaliation in violation of § 1981; violation of his Equal Protection rights pursuant to § 1983; retaliation and hostile work environment under the THRA and retaliation under Title VII. On October 25, 2006, the district court granted summary judgment to the City and dismissed this case in its entirety. This appeal followed.

## DISCUSSION

### *Standard of Review*

A district court's grant of summary judgment is reviewed *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Such a grant should be affirmed when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" as to an essential element of the non-moving party's case. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if a reasonable person could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When no genuine issues of material fact exist, this Court reviews *de novo* the district court's conclusions of substantive law. *Farhat*, 370 F.3d at 588.

### *Analysis*

I.      **The Implied Cause of Action Contained in § 1981 Does Not Provide For Municipal Liability**

Plaintiff first raises several claims under § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."**5** § 1981(a). While § 1981 does not expressly afford a cause of action to private parties, the Supreme Court held in *Runyon v. McCrary*, 427 U.S. 160 (1976), that private defendants may be held liable under its provisions. *Id.* at 174–175. Plaintiff claims that § 1981 also contains an implicit cause of action against municipalities that engage in racial discrimination in employment. In *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), however, the Supreme Court held that § 1981's implicit cause of action does not extend to suits brought against state actors. *Id.* at 732. While Plaintiff argues that a 1991 amendment to § 1981 overruled *Jett*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1071–72 (1991), we disagree.

### A.      *Jett*

*Jett* presented a similar set of facts to the instant case. In *Jett*, a white football coach and schoolteacher was reassigned on the recommendation of an African-American principal. 491 U.S.

---

**5**Although the express language of § 1981 suggests that its protection does not extend to "white citizens," the Supreme Court has held that white plaintiffs may state a claim under § 1981. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976).

at 706–707.  Alleging race discrimination, the coach sued the school district under § 1981.  *Id.*  In a decision dismissing this § 1981 claim, the Supreme Court held that, even though § 1981 creates an implicit cause of action against private defendants, state actors such as the school district may not be sued directly under that statute.  *Id.* at 731–32.

In so holding, the Supreme Court also held that a dichotomy exists between rights and remedies created by federal statute.  When Congress creates a right, but provides no means of enforcing that right, then a private cause of action is implicit in the rights-creating statute.  *See id.* ("In the context of the application of § 1981 and § 1982 to private actors, we had little choice but to hold that aggrieved individuals could enforce this prohibition, for there existed no other remedy to address such violations of the statute." (emphasis and internal quotations removed)).  On the other hand, when a rights-creating statute contains no express cause of action, but a means of enforcing that right is contained elsewhere in federal law, then the Court must examine whether Congress intended to create multiple means of vindicating the same right.  *See id.* at 732 ("[W]hatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute."); *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.")

Applying this method of statutory interpretation, *Jett* first looked to the express language of both § 1981 and § 1983.  While § 1981 is "completely silent" on the issue of whether or not it creates a private cause of action against state actors, § 1983, as originally enacted, provides that any person who, under color of law, deprives another of a right secured by law "shall . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . ."  *Jett*, 491 U.S. at 712*,* 723.  In other words, the language of § 1983 creates a cause of action for persons deprived of any civil right, including the "rights guaranteed by § 1981."  *Id.* at 733.  Accordingly, *Jett* fell into the category of cases where a rights-creating statute (§ 1981) contains no express cause of action, but a means of enforcing that right is contained elsewhere in federal law (§ 1983).  Therefore, a plurality of the Court determined that it must consider "the text and history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of §§ 1981 and 1983 respectively" to determine whether Congress intended to create multiple means of vindicating the rights created by § 1981.[6]  *Id.* at 712.

In an extensive discussion of the legislative history of §§ 1981 and 1983, the plurality determined that § 1983 "was designed to expose state and local officials to a new form of liability." *Id.* at 723 (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259 (1981)).  According to *Jett*, "[b]oth proponents and opponents in the House viewed [§ 1983] as working an *expansion* of federal jurisdiction.  Supporters continually referred to the failure of the state courts to enforce federal law designed for the protection of the freedman, and saw [§ 1983] as remedying this situation by interposing the federal courts between the State and citizens of the United States."  *Id.* at 725.  In other words, the framers of the 1871 bill which became § 1983 believed such a bill was necessary because no federal cause of action already existed to protect against civil rights violations by state

---

[6]While Justice Scalia joined the judgment and most of the opinion of the Court in *Jett*, he indicated in a two sentence separate opinion that he did not join the portions of the opinion which rely on legislative history.  491 U.S. at 738 (Scalia, J., concurring in part and concurring in the judgment). Justice Scalia's opinion does not expressly address whether a private cause of action against state actors exists under § 1981, but instead suggests that, even if such a cause of action exists, it does not protect any rights not already encompassed by § 1983.  *See id.* at 738–39 (opinion of Scalia, J.) ("To hold that the more general provisions of 42 U.S.C. § 1981 establish a mode of liability for a particular category of offense by municipalities that is excluded from the closely related statute . . . would violate the rudimentary principles of construction that the specific governs the general . . . .")  Four Justices joined a dissenting opinion by Justice Brennan. *Id.* at 739 (Brennan, J., dissenting).

actors. Such a belief would only be possible, however, if a private cause of action against state actors was not already created by the 1866 bill which became § 1981. *See id.* at 734 ("[T]he 42d Congress which enacted the precurser [sic] of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state government actors.")

### B. The 1991 Amendment to § 1981

Two years after the decision in *Jett*, Congress enacted the Civil Rights Act of 1991, which added two new subsections to § 1981:

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

§ 1981 (b) & (c). Plaintiff now argues that the language contained in new subsection (c) is intended to ensure that "§ 1981 rights are to receive parallel protections against state actors and private actors," thus extending § 1981's implied cause of action against private defendants to violations committed by state defendants. *Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1213 (9th Cir. 1996).

The circuits are split on whether subsection (c) creates a private cause of action against state actors, thus overruling the Supreme Court's decision in *Jett*. *Compare id. with Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) ("[S]ubsection (c) . . . hardly confronts the holding in *Jett*."); *Butts v. County of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) ("[Section] 1981 makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation."); *Dennis v. County of Fairfax*, 55 F.3d 151, 156 n. 1 (4th Cir. 1995) ("[S]ubsection (c) did not purport to overrule *Jett*'s holding with respect to municipal liability . . . ."). In order to determine which side of this split the Sixth Circuit will join, this Court must determine whether subsection (c) "displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. Such an inquiry reveals that § 1981(c) does not provide Plaintiff with the cause of action he seeks.

### 1. Section 1981(c)'s Statutory Language

This Court's exploration of the intent behind § 1981(c) must begin with "the text and structure" of the statute. *Id.* at 288. Subsection (c) provides that "[t]he rights protected by [§ 1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." § 1981(c). According to the Ninth Circuit, "by including language that explicitly protects § 1981 rights from 'impairment' by *both* private and governmental entities, the amendment makes clear that Congress intended a comparable scope of protection against each type of defendant." *Federation*, 96 F.3d at 1213. While § 1981(c)'s express language does indeed establish that individuals possess equal *rights* under § 1981 against both private and state discrimination, such rights-creating language does not answer the question of whether civil rights plaintiffs enjoy the same *remedy* regardless of the identity of the defendant. *See Butts*, 222 F.3d at 894.

As the Supreme Court explained in *Jett*, a dichotomy exists between rights and remedies. Just because a statute includes rights-creating language does not mean that it also provides a private cause of action to persons deprived of those rights, so long as Congress has also provided an effective means of vindicating the right elsewhere in federal law. *See Jett*, 491 U.S. at 731 ("That we have read [§ 1981] to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the 'state action' portion of § 1981, where Congress has established its own remedial scheme.") Accordingly, the fact that § 1981(c) establishes equal rights for parties suing private and state defendants does not, on its own, establish a private cause of action. Nevertheless, the absence of an express cause of action is also not dispositive of the scope of § 1981(c), and a congressional intent to create an implied cause of action may be inferred from other sources, such as the legislative history of a statute. *Id.* at 712 (plurality opinion); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) (examining legislative history to determine if an implied cause of action is created by statute).

### 2.    Section 1981(c)'s Legislative History

Subsections (b) and (c) of § 1981 were both added by the Civil Rights Act of 1991. Pub. L. No. 102-166, 105 Stat. at 1071–72. The Civil Rights Act of 1991 was enacted for the express purpose of "respond[ing] to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." 105 Stat. at 1071. Congress believed that recent decisions by the Supreme Court had "cut back dramatically on the scope and effectiveness of civil rights protections," leaving what remained of historic civil rights legislation "[in]adequate to deter unlawful discrimination or to compensate victims of intentional discrimination." H.R. Rep. No. 102–40(I), at 18 (1991), *reprinted in* 1991 U.S.C.C.A.N 549, 556. Much of the Act is intended to "restor[e] the civil rights protections that were so dramatically limited" by these Supreme Court decisions. *Id.* Accordingly, this Court's inquiry must focus on whether *Jett* was one of the decisions which "so dramatically limited" civil rights as to justify a corrective Act of Congress.

A brief review of the Act's legislative history reveals that *Jett* was not one of the decisions Congress sought to correct. Instead, the Act's amendments to § 1981 were intended to overrule the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) ("*Patterson II*").

*Patterson II* decided two questions which are relevant to the enactment of the Civil Rights Act of 1991. First, although § 1981 protects against race discrimination in the "mak[ing] and enforce[ment]" of contracts, *id.* at 176, *Patterson II* narrowly construed this language to encompass only "the formation of a contract" and "efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes . . . ." *Id.* at 176-77. Second, the Court considered whether to overrule *Runyon v. McCrary*'s holding that § 1981 "prohibits racial discrimination in the making and enforcement of *private* contracts." *Id.* at 171 (quoting *Runyon*, 427 U.S. at 168) (emphasis added).

The Court's decision to consider this second issue surprised even some of the Justices themselves. *See Patterson v. McLean Credit Union*, 485 U.S. 617, 619 (1988) ("*Patterson I*")[7] (Blackmun, J., dissenting) ("The Court's determination now to reach out to reconsider that prior decision and everything that has been built upon it, is neither restrained, nor judicious, nor consistent with the accepted doctrine of *stare decisis*."); *id.* at 621 (Stevens, J., dissenting) ("The Court's spontaneous decision to reexamine our holding in *Runyon v. McCrary*, is certain to engender

---

[7]*Patterson II* contains the Court's substantive analysis of the questions presented in that case. *Patterson I* was a brief order, issued after the first round of oral arguments, which ordered the parties to brief and argue the question of "[w]hether or not the interpretation of 42 U.S.C. § 1981 adopted by this Court in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), should be reconsidered?" *Patterson I*, 485 U.S. at 617.

widespread concern in those segments of our population that must rely on a federal rule of law as a protection against invidious private discrimination." (internal citations omitted)). Furthermore, while the Court eventually chose not to overrule *Runyon*, a majority of the Justices joined an opinion that relied exclusively on the doctrine of *stare decisis* as their rationale for this decision. *Patterson II*, 491 U.S. at 171–176.

The legislative history of § 1981(b) and (c) reveals that both subsections are directed at the Supreme Court's decision in *Patterson II*. Section 1981(b) expressly overruled *Patterson II*'s interpretation of the words "make and enforce," establishing that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981 (b); *see also* H.R. Rep. No. 102–40(II), at 37 ("The impact of *Patterson* has been disastrous. Last year, the Committee took notice that more than 200 Section 1981 race discrimination claims had been dismissed because of *Patterson*.") Read in context with § 1981(b), § 1981(c) is best understood as also addressing the Supreme Court's decision in *Patterson II*.

The legislative history on §1981(c) indicates that it was "intended to codify *Runyon v. McCrary*," H.R. Rep. No. 102-40(II), at 37; *see Bolden*, 441 F.3d at 1136 (holding that Congress intended § 1981(c) to codify *Runyon*); *Butts*, 222 F.3d at 894 (same); *Dennis*, 55 F.3d at 156 n.1 (same); *Federation*, 96 F.3d at 1212 (same), and indeed such an interpretation of subsection (c) is consistent with the judicial history of § 1981. Subsection (c) was enacted in the exact same legislation as subsection (b), and subsection (b)'s facial language reveals that it was intended to overrule part of the Supreme Court's decision in *Patterson II*. *See* § 1981(b) (defining the words "make and enforce contracts"). *Patterson II*'s interpretation of the words "make and enforce contracts," which was overruled by § 1981(b), was not the only issue in that case, however. The Court also considered overruling *Runyon*, and a majority of the Court even suggested that *Runyon* was on life-support, kept alive only by the doctrine of *stare decisis*. *Patterson II*, 491 U.S. at 171–176. Section 1981(c) reflects Congress' determination that *stare decisis* provided an inadequate firewall against a future Supreme Court decision obviating the rights recognized by *Runyon*; nothing in § 1981(c)'s history or text indicates that Congress intended it to serve some other purpose. Accordingly, we conclude that § 1981(c) was directed at preserving the Supreme Court's decision in *Runyon*, not, as Plaintiff argues, at overruling *Jett*.[8]

Having rejected Plaintiff's argument that § 1981(c) overrules *Jett*, this Court has no choice but to follow *Jett* as binding authority. Accordingly, we hold that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," *Jett*, 491 U.S. at 733; no independent cause of action against municipalities is created by § 1981(c).[9]

---

[8]This reading of § 1981(c) is bolstered by the fact that, although the Civil Rights Act of 1991 names several Supreme Court decisions in both its text and legislative history which the act is intended to overrule, neither "even mention[s] the Supreme Court's opinion in *Jett*." *Butts*, 222 F.3d at 894.

[9]Moreover, even if we were to hold that an implied cause of action exists against municipalities under § 1981, the only Court of Appeals to hold that such a remedy is implicit in § 1981 also held that the rights protected by § 1981 are coextensive with those already protected by § 1983. *See Federation*, 96 F.3d at 1214 ("Allowing plaintiffs to bring suits against municipalities directly under § 1981 to enforce § 1981 rights instead of under § 1983 imposed no substantive change on federal civil rights law.")

## II.  The District Court Properly Granted Summary Judgment on Defendant's § 1983 Disparate Treatment Claim

Plaintiff next claims that he suffered disparate treatment on account of his race, in violation of the Equal Protection Clause.  While § 1983 permits suits against municipalities for Equal Protection claims, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.* 436 U.S. 658, 694 (1978).  Accordingly, we must determine whether or not the alleged discrimination occurred as a result of an official City of Memphis policy or custom.  Because we conclude that one alleged act of discrimination was made pursuant to a municipal policy, the merits of that claim will then be discussed.

### A.  Municipal Liability

Plaintiff's allegations of disparate treatment are not a model of clarity.[10]  Liberally construed, however, Plaintiff appears to be claiming that his constitutional rights were violated on three separate occasions.  First, Plaintiff claims that Lieutenant Cox, motivated by racial animus, transferred him out of Ward 828 and replaced him with African-American officers.  Second, Plaintiff claims that Lieutenant Cox falsely accused him and other white officers of incorrectly drafting their accident reports, but did not make the same accusations of African-American officers. Finally, Plaintiff claims that the MPD's investigation of Lieutenant Cox's insubordination charges, and Plaintiff's eventual suspension, were tainted by racial bias.

### 1.  Custom of Inaction

Plaintiff claims that his transfer out of Ward 828 and Lieutenant Cox's criticism of his accident reports were both conducted pursuant to a municipal policy or custom because "Major Cooper[] reveled in the discriminatory acts of Lt. Cox against Mr. Arendale based upon his acquiescence of same." (Plaintiff's Br. at 26)  Liberally construed, Plaintiff seems to be arguing that the City may be held liable under § 1983 for its custom of inaction in failing to respond to Lieutenant Cox's alleged discrimination.  To state a municipal liability claim under an "inaction" theory, Plaintiff must establish: (1) the existence of a clear and persistent pattern of discrimination by municipal employees; (2) notice or constructive notice on the part of the City; (3) the City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the City's custom was the "moving force" or direct causal link in the constitutional deprivation.  *Powers v. Hamilton County Pub. Defender Comm'n,* 501 F.3d 592, 607 (6th Cir. 2007); *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996).

In addition to his own allegations against Lieutenant Cox, Plaintiff cites two instances which he believes establish that the City deliberately ignored Cox's alleged discrimination.  First, Plaintiff points to an affidavit by his white partner, Officer Chaudoin, who claims that Lieutenant Cox once denied Chaudoin a day off on the same day that he granted an African-American officer's request.  Second, Plaintiff notes that another white officer, Joe Giannini, once filed a charge of discrimination against Lieutenant Cox with the EEOC.  Even assuming that these incidents prove impermissible bias on the part of Lieutenant Cox, and even assuming that they are sufficient to establish a "clear and

---

[10]For example, on page 25 of his brief, Plaintiff says he was treated differently than African-American officers because "Lt. Cox consistently berated Mr. Arendale and other white officers regarding alleged incorrect drafting of police reports . . . ." (Plaintiff's Br. at 25)  Two pages later, however, Plaintiff states that "Mr. Arendale does not allege that the unfounded criticism made by Lt. Cox of the incident reports make up his claim of disparate treatment." (Plaintiff's Br. at 27)

persistent pattern" of discrimination by Lieutenant Cox, they are insufficient to demonstrate a custom of inaction on the part of the City.

In order to establish that the City's "failure to act can be said to amount to an official policy of inaction," the evidence must demonstrate more than just "a collection of sloppy, or even reckless, oversights . . . ." *Doe*, 103 F.3d at 508. Rather, the record must show that the City "consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct." *Id.* Given this standard, none of the incidents Plaintiff cites are sufficient to establish a custom of inaction on the part of the City.

Officer Chaudoin's accusation against Lieutenant Cox is easily disposed of. In order to prove that the City "consciously never acted when confronted with its employees' . . . conduct," the record must show that the City was actually confronted with Lieutenant Cox's conduct. *Id.* Plaintiff cites no evidence, however, indicating that Chaudoin reported Cox's alleged discrimination in granting time off requests, nor does he argue that the City was constructively aware of Cox's alleged discrimination in granting leave.

Similarly, the allegations of Officer Giannini are also insufficient to demonstrate that the City failed to act when confronted with evidence of unconstitutional conduct. When a reliable government agency, tasked with the investigation of alleged constitutional violations, concludes after a thorough investigation that no violation has occurred, a municipality is permitted to rely on the results of that investigation. *See id.* In deposition testimony, Lieutenant Cox testified that he was cleared of any charges after a substantial investigation by an EEOC attorney. Although Cox does not have personal knowledge of the full extent of this investigation, he testified that he was required to attend "several interviews" each lasting "anywhere from 30 minutes to an hour." Plaintiff does not deny that this investigation took place, or that Lieutenant Cox was cleared of the allegations leveled against him by Officer Giannini.

Furthermore, the record does not support Plaintiff's claim that Lieutenant Cox engaged in "egregious and obviously unconstitutional conduct" when he transferred Plaintiff out of Ward 828, or when he criticized Plaintiff for his accident reports. *Id.* With respect to the transfers, Major Cooper testified that he—not Lieutenant Cox—made the decision to transfer Plaintiff to a different ward on account of the large volume of complaints he had received from residents of Ward 828 about officer responsiveness. Plaintiff presents no evidence to refute this testimony, and indeed Plaintiff himself testified that he was informed at the time of the transfer that the decision was made at a meeting of senior management.[11] The City has introduced substantial evidence that Major Cooper, a white supervisor, made the decision to transfer Plaintiff. Plaintiff has raised no allegations that Cooper was motivated by animus against white people, and indeed his own statements corroborate Major Cooper's testimony. Faced with this record, the City cannot be held to have ignored "egregious and obviously unconstitutional conduct" when Plaintiff was transferred out of Ward 828.

Nor does the record support Plaintiff's claim that the City may be held liable for Lieutenant Cox's criticism of his accident reports. Once again, Plaintiff relies entirely on conclusory statements to support his claim that Cox's criticism was motivated by racial animus. As his only evidence that Cox acted impermissibly in criticizing the reports, Plaintiff cites to his own deposition testimony that "[T]here was no reason . . . to call me in and berate me about a report that was done correct . . . it couldn't have been any other reason than race." (J.A. 312) Plaintiff has presented nothing more than his own subjective opinion to justify his allegations that the City discriminated against him by

---

[11]Moreover, Major Cooper's testimony that Plaintiff was not attentive to his duties is corroborated by Plaintiff's own statements that he initially sought a transfer to the Northeast Precinct because "the work at the Northeast Precinct was not as hard or stressful as the other precincts," (J.A. 29), and that he wanted to remain in Ward 828 because that ward is "one of the better and less stressful wards in the Northeast Precinct." (Plaintiff's Br. at 4)

allowing Lieutenant Cox to criticize his accident reports. Such conclusory statements are not sufficient to survive *any* motion for summary judgment, much less to allow a municipality to be held liable for the acts of its employees. *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." (internal quotations omitted)).

### 2.    Plaintiff's Suspension

Although the record does not support municipal liability with respect to Plaintiff's reassignment out of Ward 828 and with respect to Lieutenant Cox's criticism of his accident reports, the City is potentially liable for its decision to suspend Plaintiff. Generally speaking, a municipality is not liable under § 1983 for the decisions of its officers. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) ("[A] municipality cannot be made liable by application of the doctrine of *respondeat superior*."). When, however, an allegedly unconstitutional decision is made by an official with "final policy making authority," then the municipality may be held liable for that official's decision, so long as the decision was made by "the official or officials responsible under state law for making policy in *that area* of the city's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Furthermore, as the Supreme Court explained in *Praprotnik*, the hallmark of municipal liability is the *finality* of the decision being reviewed:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Id.* at 127. In other words, even if the allegedly unconstitutional decision is initially made by a subordinate official, when that decision is appealed to and affirmed by an official with final authority over a matter, the municipality may be held liable for this affirmance.

Applying this framework to the instant case, it is clear that the City may be held liable for the final decision of Chief Wright. Although the Memphis City Charter allows a disciplined City employee who is suspended for more than ten days to appeal this decision to the Civil Service Commission, neither the charter nor the city code provides an appeal beyond the MPD when a police officer receives a suspension of ten days or less. Memphis, Tenn. Charter, art. 34, § 247. Turning then to the MPD's internal procedures, MPD policy provides for a two stage review of a disciplinary charge against an officer. Under these procedures, such a disciplinary charge is initially reviewed by an "Administering Authority." *Memphis Police Dep't Pol'y and Procedures Manual* 3 (2003).[12] While an Administering Authority may be of any supervisory rank, no officer below the rank of "Shift or Squad Major" may suspend another officer, and no officer below the rank of "Precinct/Bureau Commanding Officer" may issue a suspension greater than three days. *Id.*

When an Administering Authority sustains a charge of discipline against an officer, that decision may be appealed to an "Appeal Authority." *Id.* Like an Administering Authority, an Appeal

---

[12] Although Plaintiff failed to include the MPD's policy manual in the record, "whether a particular official has final policymaking authority is a question of *state law*," and thus must be determined by a judge. *Praprotnik*, 485 U.S. at 123 (internal quotations omitted). Because the question of whether an official has final policy making authority is a question of law, this Court is no more constrained by the record than it is forbidden to cite a Supreme Court case not relied upon by the parties.

Authority may be of any supervisory rank, provided that they are "a commanding officer or manager in the same chain of command at a higher level than that of an administering authority who hears appeals." *Id.* Significantly, "the appeal authority shall be the last stage in the departmental review and appeal procedure." *Id.* at 6.

In the instant case, Lieutenant Cox issued a charge of discipline against Plaintiff. This charge was sustained by Major Cooper, who served as Plaintiff's Administering Authority. As the Administering Authority, Major Cooper suspended Plaintiff from duty. Plaintiff then appealed this decision to Chief Wright, who acted as Plaintiff's Appeal Authority, and Chief Wright sustained the suspension. As the Appeal Authority, Chief Wright has final decision making power within the Memphis Police Department. *Id.* Furthermore, as neither the Memphis Charter nor the Memphis City Code provide for further review of Plaintiff's suspension, Chief Wright had "final policy making authority" with respect to Plaintiff's disciplinary charge. *Praprotnik*, 485 U.S. at 123. Accordingly, insofar as Plaintiff's suspension was unconstitutional, the City may be held liable under § 1983 for the final disciplinary decision of Chief Wright.

## B.        The Merits of Plaintiff's Disparate Treatment Claim

Having determined that the City may be held liable under § 1983 for an Appeal Authority's decision to suspend an employee for ten days or less, we now turn to the merits of Plaintiff's claim that his suspension occurred as a result of racial discrimination. In weighing an employment discrimination claim asserting disparate treatment under § 1983, this Court applies the familiar *McDonnell Douglas* framework applicable in similar cases brought under Title VII. *See Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) ("[T]his court looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983.") Under this burden-shifting framework:

> [A] plaintiff must first set forth a prima facie case of discrimination. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. The ultimate burden of persuasion remains at all times with the plaintiff.

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001) (internal quotations and citations omitted).

Generally speaking, a plaintiff alleging employment discrimination in employee discipline must make a four-part showing in order to set forth a *prima facie* case of discrimination: "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* at 406. Where, as here, a plaintiff alleges "reverse discrimination"—that is, he is a member of the majority claiming employment discrimination—the plaintiff bears the burden of "demonstrating that he was intentionally discriminated against 'despite his majority status.'" *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (quoting *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983)). Accordingly, the first prong of the *prima face* case is adapted to require the plaintiff to prove "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (internal quotations omitted). Similarly, to satisfy the fourth prong, Plaintiff must show that the City treated differently similarly situated employees of a different race. *Id.*

Plaintiff is a seventeen-year veteran of the MPD, and the City does not contest that he is qualified for his job as a police officer. Similarly, the City does not contest—and could not reasonably do so—that Plaintiff's suspension from duty constitutes an "adverse employment decision." Accordingly, this case rests upon the first and fourth prongs of the *prima facie* case: whether Plaintiff has shown background circumstances to support the suspicion that the City is that unusual employer who discriminates against the majority, and whether Plaintiff was treated differently than similarly situated non-white employees. *Id.*

Recent Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the *prima facie* case. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) ("[T]he person in charge of hiring for CCC, Chief Harris, was himself African-American. This is sufficient, in our opinion, to satisfy *Murray*'s 'background circumstances' requirement.") Even if this Court were to assume that Lieutenant Cox exerted sufficient influence over his white supervisors to impute his alleged racial animus onto them, however,[13] Plaintiff still has not demonstrated that he was treated differently than similarly situated non-white employees.

Lieutenant Cox testified that he has never "brought charges for poor performance" against an African-American officer. (J.A. 563) Plaintiff claims that this alone is sufficient to demonstrate that Cox "did not treat African[-]American officers the same," and therefore justifies a holding that the City is liable. (Plaintiff's Br. at 25) This argument, however, relies on a faulty comparison.

Superficial similarities between a disciplined employee and his colleagues are not sufficient to show a *prima facie* case of discrimination. While "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects." *Ercegovich*, 154 F.3d at 352 (internal quotations omitted). Plaintiff, however, offers no examples of minority officers who engaged in conduct potentially warranting discipline, but who received a lesser sanction than the one Plaintiff himself received. Though it may be true that Lieutenant Cox has not filed charges of discipline against a non-white officer, this alone is insufficient to show a *prima facie* case. Rather, Plaintiff must show that a minority officer engaged in similarly-sanctionable conduct, but received a less severe sanction. *Id.* Having failed to make such a showing, Plaintiff's disparate treatment claim cannot survive summary judgment.

### C.    Conclusion

Although Plaintiff's suspension was ratified by an official with final policy making authority, Plaintiff has failed to show a *prima facie* case of disparate treatment. Accordingly, the decision of the district court granting summary judgment on Plaintiff's disparate treatment claim is affirmed.

---

[13]When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a "rubber-stamp" or "cat's paw" theory of liability. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) ("[T]he discriminatory remarks of those who may have influenced the decision not to reassign the plaintiff to other positions in the company may be relevant when the plaintiff challenges the motive behind that decision."); *id.* (holding that the remarks of a company official who did not make an ultimate employment decision still provided proof of discriminatory motive when that official "was in a position to shape the attitudes, policies, and decisions of the division's managers"). The term "cat's paw" derives from a fable in which a monkey tricks a cat into scooping chestnuts out of a fire so that the monkey can "eagerly gobble[] them up, leaving none left for the cat." *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006). "Today the term 'cat's paw' refers to 'one used by another to accomplish his purposes.'" *Id.* (quoting *Webster's Third New International Dictionary Unabridged* 354 (2002)).

### III. The District Court Correctly Granted Summary Judgment on Defendant's Hostile Environment Claim

Plaintiff next argues that his alleged mistreatment by Lieutenant Cox created a hostile work environment. To establish a *prima facie* case and move forward with this claim, Plaintiff must overcome four hurdles. First, Plaintiff must prove "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland*, 344 F.3d at 614. Additionally, Plaintiff must show that he was subjected to unwanted racial harassment, that the harassment was based on race, and that the harassment "had the effect of unreasonably interfering with [his] work performance by creating an intimidating, hostile, or offensive work environment . . . ." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). We believe that no reasonable jury could determine that Plaintiff was harassed because of his race.

In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations. *See Lewis*, 355 F.3d at 533 ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." (internal quotations omitted)). Yet Plaintiff's allegations of racially motivated harassment rest entirely on several statements which are either conclusory or raise no inference of racial animus. Specifically, Plaintiff claims that "Lt. Cox began a barrage of racial harassment that occurred weekly that [sic] centered around Mr. Arendale writing and/or submitting allegedly improper incident reports . . . ." (Plaintiff's Br. at 34) He alleges that Lieutenant Cox "racially harassed" him when he moved him out of Ward 828, and that Cox further "racially harassed" him "when he could not justify the alleged performance reasons why he move [sic] Mr. Arendale out of [W]ard 828."[14] (*Id.* at 34-35) Plaintiff claims that Cox "continued to racially harass" him when he "falsely accused Mr. Arendale of leaving an accident scene," and while Plaintiff concedes that Lieutenant Cox eventually admitted that he was mistaken in this accusation, Plaintiff further alleges that Cox "continued to racially harass and berate" him when Cox subsequently criticized Plaintiff regarding an unknown issue. (*Id.* at 35) Accompanying none of these allegations, however, is actual evidence of racial animus. Rather, Plaintiff supports each allegation only with a citation to his own testimony stating his personal opinion that he was the victim of racial harassment.[15] Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment. *See Travelodge Hotels, Inc. v. Govan*, 155 F. App'x 235, 237 (6th Cir. 2005) (holding that briefs which are "simply filled with conclusory allegations . . . failed to present sufficient evidence" to withstand summary judgment); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982); *see also* Fed. R. Evid. 701 (limiting opinion testimony by lay witnesses).

In addition to these statements supported only by his own opinion, Plaintiff also alleges that Lieutenant Cox falsely accused Plaintiff of cursing, yelling, and throwing papers during the April 15, 2004 incident which led to his suspension, and that Lieutenant Cox had no proper grounds to require

---

[14]Plaintiff also claims that he was replaced in Ward 828 by African-American officers. The only evidence in the record that black officers were assigned to Ward 828, however, is the affidavit of Plaintiff's partner, Officer Chaudoin, who states that Lieutenant Cox assigned three African-American officers to Ward 828 *several months* after Plaintiff was assigned to a different ward. The fact that African-Americans wound up with Plaintiff's preferred ward assignment months after Plaintiff was transferred hardly raises an inference that Plaintiff's assignments were motivated by racial animus. Moreover, even if Lieutenant Cox did wish to reassign Plaintiff for racially motivated reasons, Plaintiff has submitted no evidence to rebut Major Cooper's testimony that Cooper—not Cox—personally made the decision to reassign Plaintiff out of Ward 828.

[15]Plaintiff also alleges that "Lt. Cox racially harassed Mr. Arendale when he filed the statement of charges for insubordination . . . ." (Plaintiff's Br. at 36) This conclusory statement, however, is not supported by any citation to the record, and we were unable to find any support in the record for this allegation. Accordingly, it may be discounted. *See Lewis*, 355 F.3d at 533.

him to write a memo about why a retired police officer was wandering the building. To support his first allegation, Plaintiff cites to Major Cooper's testimony that Lieutenant Cox accused Plaintiff of cursing, and to the affidavits of two witnesses who state that they do not recall any such cursing. To support the second allegation, Plaintiff cites the testimony of Cooper and another police major, both of whom state that a retired police officer should be permitted to look at pictures, so long as the desk officer was aware of the retired officer's location. Glaringly absent from Plaintiff's evidence, however, is anything which might raise an inference of *racially* motivated harassment. While Plaintiff's evidence might allow a reasonable jury to determine that Lieutenant Cox overreacted, or that he does not particularly like Plaintiff, or even that Cox may have at times behaved obnoxiously, it provides no support for Plaintiff's conclusory allegations of racial animus. Title VII does not create a "general civility code" in the workplace; it forbids racially motivated harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Absent proof of such impermissible bias, Plaintiff's hostile environment claim cannot survive summary judgment. Accordingly, the decision of the district court granting summary judgment on this claim is affirmed.

## IV. The District Court Properly Granted Summary Judgment on Defendant's Retaliation Claims

Finally, Plaintiff alleges that Lieutenant Cox created the April 15, 2004 conflict which led to Plaintiff's suspension, and that Major Cooper affirmed Cox's charges against Plaintiff, in retaliation against Plaintiff's February 21, 2004 EEOC filing. He brings this claim of unlawful retaliation under both Title VII and the THRA. Because the Tennessee "legislature intended the THRA to be coextensive with federal law," a retaliation claim under both statutes follows the same analysis. *Phillips v. Interstate Hotels Corp. No. L07*, 974 S.W.2d 680, 683 (Tenn. 1998).

To establish a *prima facie* case of retaliation, Plaintiff must establish that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). While temporal proximity between an assertion of Title VII rights and an adverse employment action provides highly probative evidence of a causal connection, "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* at 566.

Plaintiff claims that "the fact that the retaliatory events occur [sic] just two months after the EEOC charge of discrimination is enough by itself to support the causal connection element." (Plaintiff's Br. at 43) This is simply a misstatement of the law. Absent other evidence of retaliation, Plaintiff's retaliation claim must fail. *Nguyen*, 229 F.3d at 563 As his sole additional evidence of retaliatory intent, Plaintiff again refers to his own testimony, this time citing his own statement that an MPD captain told him that Major Cooper was "out to get him for filing EEOC charges of discrimination in February 2004." (J.A. 929) The district court, however, excluded this statement as inadmissable hearsay, and Plaintiff does not challenge this exclusion on appeal. Faced with no additional competent evidence of retaliation, we hold that the district court properly granted summary judgment to the City.

### CONCLUSION

The district court properly granted summary judgment to the City on each of Plaintiff's claims. Under the Supreme Court's holding in *Jett*, § 1981 does not create a private cause of action against a municipality. 491 U.S. at 732. Because we conclude that no Supreme Court case or Act of Congress has overturned this holding, we have no choice but to reject Plaintiff's § 1981 claims. Similarly, Plaintiff's other claims lack merit. Both his disparate treatment and hostile environment claims require a showing that City employees were motivated by racial animus, but the record

provides no evidence that the alleged ill-treatment of Plaintiff was influenced by his race. Plaintiff's retaliation claim also fails because Plaintiff relies almost entirely on inadmissible hearsay evidence in support of this claim. Inasmuch as Plaintiff's § 1981 claim fails as a matter of law, and no reasonable jury could find facts supporting Plaintiff's additional claims, we **AFFIRM** the district court's decision granting summary judgment to the City.

---

## CONCURRING IN PART AND CONCURRING IN THE JUDGMENT

---

COOK, Circuit Judge, concurring in part and concurring in the judgment. I concur in the judgment and opinion of the court with the exception of its analysis of and reliance on the Civil Rights Act of 1991's legislative history.