NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0725n.06

**No. 13-4011**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 16, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARIE WEAVER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CITY OF TWINSBURG, OHIO, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: CLAY** and **STRANCH**, Circuit Judges; **BLACK**, District Judge.[*]

**BLACK**, District Judge. Marie Weaver ("Weaver") appeals the district court's

grant of summary judgment in favor of the City of Twinsburg. Weaver argues that the

district court erred in granting summary judgment on both her retaliatory suspension

claim and her retaliatory termination claim, where there was temporal proximity between

her protected activity and the adverse action. We find that the district court appropriately

granted summary judgment. As such, we **AFFIRM**.

## I.     BACKGROUND FACTS

Weaver was hired by the City of Twinsburg as a Deputy Clerk of City Council on

November 13, 2006. In January 2008, Weaver was promoted to Acting Clerk of Council,

and on March 8, 2008, she was officially named Clerk of Council. (*Id.*) As Clerk of

_____

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of
Ohio, sitting by designation.

Council, Weaver was responsible, in some part, for fulfilling public record requests, for updating Council's agendas, and for submitting some ordinances to the proper state bodies. While Clerk of Council, Weaver was Council's employee, reported directly to Council, and was under Council's exclusive control for purposes of hiring, discipline, and firing. She held the Clerk's position until March 11, 2009, the day the City terminated her. Weaver was the only African American working at Twinsburg City Hall. (R. 36–3 at PageID 467).

Weaver had been the Clerk for roughly three months when Council passed an ordinance that allowed for levying an annual fee related to motor vehicle licensing. Weaver was charged with providing this ordinance to the Ohio Department of Public Safety. On July 29, 2008, that Department informed Weaver that the ordinance had been received after the July 1, 2008 deadline, and therefore Twinsburg could not begin collection until 2010. This caused a loss of revenue of roughly $86,000. At the time the error was discovered, there was some dispute over the allocation of blame with Mayor Procop blaming Weaver, and several councilmen believing that the Finance Director had voluntarily taken responsibility for ensuring the ordinance was timely submitted.

In addition to failing to timely submit the ordinance, Weaver was also accused of insubordination during a meeting with Mayor Procop on October 16, 2008. An administrative assistant who overheard portions of the conversation indicated that she had "never heard any employee ever talk to any Mayor or City Manager like that." (R. 36–12

at PageID 617). Weaver contends that she remained professional throughout the encounter and was unfairly attacked by Mayor Procop.

During the executive session of the next Council meeting, on October 28, 2008, Council discussed the missed filing deadline and Weaver's alleged insubordination. Council agreed at that time to refrain from taking any action until Weaver's six month review was completed on October 31, 2008 and until they had the opportunity to speak to legal counsel about options. The next Council meeting was set for November 18, 2008. (*Id.*) Three days after the executive session, on October 31, 2008, the City gave Weaver a performance evaluation. While Plaintiff received "Needs Improvement" in several areas, her aggregate scores resulted in ratings of "Effective" and "Exceeds Expectations." (*Id.*)

On November 14, 2008, Twinsburg Law Director David Maistros instructed Weaver to amend the Council meeting agenda to include an executive session for discussing "personnel issues." On November 18, 2008, the day of the scheduled Council meeting, Weaver's legal counsel emailed Mayor Procop to inform her that Weaver had contacted the EEOC regarding a racial discrimination claim. The email indicates that Council members would receive courtesy copies with information regarding Weaver's contact with the EEOC. (*Id.*) It is unclear if or when Council members received this information.

Council proceeded with the scheduled executive session, during which they discussed the missed filing deadline and Weaver's alleged insubordination. Ultimately, Council determined that Weaver should receive a pre-disciplinary hearing before any punishment was imposed. Council appointed Frank Beni, the Chair of Twinsburg's Civil Service Commission, to preside over the hearing. The hearing was held on November 25, 2008, and thereafter, Beni concluded that Weaver had been insubordinate and that there was cause for corrective action. Council then offered Weaver the choice of a two-day suspension or enrollment in an Employee Assistance Program ("EAP"). Weaver declined the EAP and on December 1, 2008, Twinsburg suspended her for two days.

Weaver served her suspension in December 2008 and returned to work without incident. However, in early 2009, Maistros' assistant relayed to him a portion of a phone conversation in which she overheard Weaver tell someone that she would send them a copy of one of Maistros' legal opinions. Maistros then used software known as Barracuda to search through old emails on Twinsburg's server. Through this search, Maistros learned that Weaver had supplied a substantial number of documents to Marcella "Sally" Gaydosh. Gaydosh had frequently litigated against Twinsburg. (*Id*. at 458-60)

Maistros continued his investigation of Weaver's emails and found that between November 2008 and early March 2009, Weaver and Gaydosh had exchanged roughly 120 emails. Maistros concluded that although many of the emails were responses to public

records requests, Weaver had also provided numerous documents that had not been requested through formal channels.

The first Council meeting that occurred following Maistros' discovery was held on March 10, 2009. However, prior to that hearing, on February 24, 2009, Weaver filed a retaliation charge and perfected her racial discrimination charge with the EEOC. Maistros claims that he learned of the charges on March 6, 2009, while HR Director Morris indicated that he may have learned of the charges a day earlier on March 5, 2009. Also on March 6, 2009, Maistros requested that an executive session be added to the March 10, 2009 Council meeting to discuss personnel issues.

During the executive session, Council reviewed a packet of emails between Weaver and Gaydosh and spoke with Maistros about the content of those emails. Council then unanimously determined that Weaver should be terminated. Defendant contends that there was no discussion of Weaver's EEOC charges during the executive session. Council was then provided with pre-prepared termination letters that were signed and delivered to Weaver the following day.

Weaver contends that Twinsburg retaliated against her on two occasions for contacting the EEOC. She contends that her November 2008 suspension was retaliation for her first contact with the EEOC and that her March 2009 termination was retaliation for her second contact with the EEOC. Twinsburg contends that no retaliation occurred and that Weaver was properly disciplined and terminated. Weaver timely appeals the

order of the district court granting summary judgment in favor of Defendant City of Twinsburg.

## II.     STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (*en banc*).  Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.  56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The evidence must be considered in the light most favorable to the non-moving party, but there must be more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That is, there must be more than a "mere existence of a scintilla of evidence" to satisfy the plaintiff's burden.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.   ANALYSIS

To establish a *prima facie* case of retaliation, Weaver must demonstrate by a preponderance of the evidence that: (1) she engaged in a protected activity under Title VII; (2) her protected activity was known to Twinsburg; (3) Twinsburg took adverse employment actions against her; and (4) there was a causal connection between the adverse employment action and the protected activity.  *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013).  As to the fourth element, "[t]he burden of proof at the *prima facie*

stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

On appeal, Weaver argues that the evidence is sufficient to raise issues of fact as to whether her suspension and ultimate termination were causally related to her protected activity.

### A. Suspension

First, Weaver alleges that her December 2008 suspension was in retaliation for filing an EEOC complaint in November 2008. There is no dispute that Weaver engaged in protected activity when she filed her November 2008 EEOC complaint.

An adverse employment action is a "materially adverse change in the terms and conditions of . . . employment." *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). An adverse employment action involves changes in the terms of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and usually "inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62

(1998). Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins*, 188 F.3d at 662.[1]

At the conclusion of Mr. Beni's independent investigation, he found cause for corrective action. Weaver conceded that she should have been disciplined. The suggested corrective action included participation in an EAP or a two-day suspension. Weaver argues that her suspension was an adverse employment action.

Plaintiff fails to cite any case where a court found that an EAP was an adverse employment action. *See, e.g., Novotny v. Reed Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008) (the fact that plaintiff's calendar was closely scrutinized, she was left off of out-of-office emails, she was referred to executive coaching, she was pushed for input on her development plan, and she was placed on a corrective action plan, did not qualify as adverse employment actions).[2] Here, Weaver claims that she did not opt for the EAP

---

[1] *See also Crawford v. JP Morgan Chase & Co.*, No. 12–3698, 2013 U.S. App. LEXIS 16374, at *6 (6th Cir. Aug. 6, 2013) ("In addition to terminations and pay reductions, demotions and negative changes in job responsibilities generally are sufficient to create a genuine issue of material fact as to whether the plaintiff suffered an adverse employment action.").

[2] *See also Delia v. Donahoe*, 862 F. Supp. 2d 196, 202 (E.D.N.Y. 2012) (EAP referral is not an adverse action); *Jenkins v. Med. Labs. of E. Iowa, Inc.*, 880 F. Supp. 2d 946, 961 (N.D. Iowa 2012) (a requirement to attend EAP counseling does not constitute a "tangible change in working conditions that produces a material employment disadvantage."); *Choulagh v. Holder*, No. 10-14279, 2012 U.S. Dist. LEXIS 98271, at *21–22 (E.D. Mich. July 16, 2012) (recommending that the plaintiff explore an EAP referral is not an adverse employment action); *Waters v. Gen. Bd. of Global Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) (recommendation that plaintiff attend EAP counseling sessions does not constitute an adverse employment action); *Logan v. Henderson*, No. C2-00-0978, 2002 U.S. Dist. LEXIS 15679, at *18 (S.D. Ohio Feb. 8, 2002) (the fact that plaintiff had to enroll in an EAP to deal with on-the-job stress is not an adverse employment action).

because she "didn't need the EAP…[t]here was no reason or cause for [her] to need their services." (R. 36–3 at PageID 507). Accordingly, Weaver argues that this *Hobson*'s choice[3] constitutes an adverse employment action. *See Blume v. Potter*, 289 F. App'x 99, 106 (6th Cir. 2008) (an illusory choice of employment options resulted in an adverse action).[4] The fact that Weaver did not think she needed services from the EAP does not render this an illusory choice. In fact, Weaver conceded that she should have been disciplined.

While a suspension without pay is an adverse employment action, Weaver *chose* the suspension in lieu of the EAP. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71–72 (2006). We decline to find an adverse employment action where Weaver chose the suspension. *See Hill v. Pharmacia & Upjohn Co*., 67 F. App'x 277, 282 (6th Cir. 2003). Weaver's decision to take a suspension instead of participating in the EAP does not create a materially adverse employment action.

---

[3] A Hobson's choice is "an apparently free choice that offers no actual alternative." *Stokes v. Scott*, 821 F. Supp. 2d 898, 911 n. 5 (E.D. Mich. Nov. 4, 2011), *rev'd on other grounds*, 527 F. App'x 358 (6th Cir. 2013).

[4] "Blume had the ability to choose between ending his employment immediately, without reaching retirement eligibility, or working up to his first eligible retirement date, but this choice was illusory. Neither option provided Blume with the opportunity to remain an employee of the Postal Service indefinitely." *Id.* at 106.

Weaver failed to prove all four elements required to establish a *prima facie* case of retaliation. Accordingly, with respect to the 2008 suspension, Weaver's claim for retaliation fails as a matter of law.

### B. Termination

Next, Weaver alleges that her March 2009 termination was retaliation for her February 24, 2009 EEOC complaint. It is undisputed that Weaver engaged in protected activity when she filed her EEOC complaint and that Twinsburg took adverse employment action against her when it terminated her employment.

Evidence that an adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). When an adverse employment action occurs close in time to when an employer learns that an employee engaged in a protected activity, temporal proximity alone is enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. *Williams v. Zurz*, No. 10–4161, 2012 U.S. App. LEXIS 22604, at *14–15 (6th Cir. 2012) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity to be sufficient evidence of causation where termination occurred on the same day the employer learned of the protected conduct)).

Weaver was terminated on March 10, 2009, approximately four to five days after her EEOC charge was received by the City of Twinsburg. The date on which the

"investigation" that led to Weaver's termination commenced is in dispute. Law Director Maistros conducted the initial Barracuda search on March 3, 2009, but only used the search term "Gaydosh." Maistros claims that he learned about the February 24, 2009 EEOC complaint on March 6, 2009, while HR Director Morris indicated that he may have learned about the charges a day earlier on March 5, 2009. It was only after learning of Weaver's EEOC charges that Maistros conducted a second Barracuda search on March 9, 2009 with the search terms "Weaver" and "Gaydosh."

Within a day after learning of Weaver's charges, Maistros asked to have an executive session added to the March 10, 2009 City Council meeting to discuss "pending or imminent litigation." On the afternoon of March 10, 2009, before Weaver's termination was even discussed with Council, Morris pre-drafted termination letters for the Council President and Vice President to sign.

Weaver need not prove that Council knew about her protected activity to prevail. If a supervisory employee acts with retaliatory animus, and the act is intended to cause and is the proximate cause of the ultimate employment action, the employer is liable under the "cat's paw" theory. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998).[5] Morris and Maistros, who had knowledge of Weaver's EEOC

---

[5] *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009) ("The 'cat's paw' theory refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse…decision, thereby hiding the subordinate's discriminatory intent.").

filings, "recommended a termination." [6] (R. 32–1 at PageID 401–2). Because Morris and Maistros knew about Weaver's EEOC charges, their recommendation of termination to City Council is sufficient to establish a *prima facie* causal connection.

Accordingly, the district court erred in finding that Plaintiff failed to establish a *prima facie* case of retaliation as to the March 2009 suspension.

### C. Legitimate Non-Discriminatory Reasons and Pretext

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment decision. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). The City of Twinsburg easily meets this burden. If the employer meets this burden of production, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate, non-discriminatory reason given is a pretext for discrimination. *Id.*

A plaintiff may establish that an employer's proffered reasons are pretextual by showing those reasons have no basis in fact, did not actually motivate the employer's action, or were insufficient to warrant the action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). The Sixth Circuit has adopted the "honest belief" rule with regard to an employer's proffered reason for discharging an employee. Under the honest belief rule, "so long as the employer honestly believed in the proffered

---

[6] Councilman Scaffide claims that he learned of Weaver's EEOC Charge during an executive session. While there is no evidence that Scaffide learned about the EEOC charge on or before March 10, 2009, it is unclear when he learned about the charge.

[nondiscriminatory] reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken" or incorrect. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). The employer's decision-making process need not be optimal, nor leave no stone unturned; "[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* at 807. To determine whether the employer had an honest belief in the proffered basis for the adverse employment action, a court should ask whether the employer reasonably relied "on the particularized facts that were before it at the time the decision was made." *Id*.

### 1. 2008 Suspension

Although Weaver established a *prima facie* case of retaliation for the 2008 suspension, she cannot demonstrate that the City Council's legitimate nondiscriminatory reasons for suspension were pretext for a discriminatory motive.

Plaintiff was suspended in 2008 for insubordination to the Mayor and a $86,000 mistake. Instead of simply disciplining Weaver, the Council appointed a neutral party to preside over a predisciplinary hearing, and not until it received the neutral party's recommendation did Council act. Weaver argues that the conclusion reached by Mr. Beni "gives rise to doubt about the objectivity of Beni's 'investigation[.]'" (Appellant

Br. at 28).[7] However, Weaver offers nothing more than conjecture to support her suggestion that Mr. Beni's investigation was impartial. There is no evidence that the actions taken by Council were in retaliation for Weaver's EEOC complaint and not for her mistake and insubordination. Accordingly, Weaver fails to evidence that City Council's articulated reason for suspension was pretextual.

### 2. 2009 Termination

Weaver was terminated for providing Gaydosh with information that was not specifically requested, not appropriate, and that caused harm to the City—all of which resulted in Weaver breaching City Council's and the City of Twinsburg's trust. Accordingly, Twinsburg has satisfied its burden of providing a legitimate, non-discriminatory reason for Weaver's termination.

Weaver argues that: (1) the City articulated inconsistent reasons for her termination; (2) a satisfactory performance review six months prior to her termination demonstrates that the City's actions were pretextual; (3) the City was to blame for her actions because it did not provide her with adequate training for responding to public records requests; and (4) she did not improperly provide documents to Gaydosh. The crux of the question is whether Weaver was terminated by City Council based upon a good faith belief that she violated their trust.

---

[7] Weaver also argues that there was a "four month delay" between her conduct and the discipline, however Council was in a three month recess following the missed deadline.

### a. Inconsistent Explanations

First, Weaver argues that the City articulated inconsistent reasons for her termination. The letter Weaver received regarding her termination stated that she "ha[d] not fulfilled the expectations of [her] position." A few days later, Morris told the local media that Weaver was terminated because of "a poor yearly performance review." In June 2009, the City indicated that Weaver was terminated for disseminating information to Gaydosh. While these reasons may be interpreted as inconsistent, it is clear that Weaver did not fulfill the expectation of her position because she acted in a manner that was contrary to City policy, put the City at risk of further litigation, violated her fiduciary duties, and compromised City Council's trust. There is insufficient evidence to establish a genuine issue of disputed fact regarding whether the City's proffered reasons for the termination were not based in fact, did not actually motivate the employer's action, or were insufficient to warrant the action.

### b. Performance Review

Next, Weaver argues that she was given a favorable performance review six months before her termination despite missing a filing deadline and the alleged insubordination. While the performance review was generally favorable, it does note several areas that "need improvement," including Weaver's ability to work and cooperate with coworkers. (R. 41–11 at PageID 954). Specifically, the performance evaluation indicates that "[t]ime taken for training and the lack of cooperation between Marie

[Weaver] and the Deputy Clerk had a negative effect on quantity of work[,]" "[t]his is one area Marie [Weaver] must improve [working with co-workers]. Marie must fine [*sic*] ways to interface with co-workers[,]" and Weaver "did not deliver an Ordinance to the proper agency in a timely manor [*sic*] that resulted in a loss of $82,000.00 of revenue." (*Id.* at PageID 953). The performance review also indicated that one of the major goals for Weaver to work toward for the next evaluation period was that she "needs to attend class (s) [*sic*] for conflict resolution." (*Id.* at PageID 955).

Therefore, although Weaver claims that she received a favorable performance review, the review reflects her inability to interact with co-workers.

### c. Training

Next, Weaver argues that she "did not know" or was not aware that she should not have provided certain information to Gaydosh, because she was never properly trained with respect to City policy regarding public record disclosures. The record evidence fails to support Weaver's contention.

Prior to becoming the Clerk of Council, Weaver served as Deputy Clerk of Council and was employed for nearly two and a half years at the time of her termination. Weaver admits that she received outside training for responding to public records requests and that she "mimicked what was done by the prior Clerk of Council." (*Id.* at PageID 478–79). Moreover, Weaver testified that she never had any concerns about

whether she was appropriately responding to records requests and never sought advice from anyone about her communications with Gaydosh.

### d. Ms. Gaydosh

Finally, Weaver claims that she did not improperly provide documents to Gaydosh.

Weaver testified that she provided Gaydosh with the City's legal invoices. However, Weaver never informed anyone at the City that such bills were being provided to Gaydosh, nor did she notify Mr. Maistros or the finance department of any such requests or the particulars of those requests. Weaver also admitted that Gaydosh was the only person to whom she provided information that was not in response to a public records request. Weaver took no steps before production to ensure that her responses were legal and proper.

Additionally, Weaver and Gaydosh sent each other emails about Twinsburg's business, including information regarding Weaver's own plans for claims against Twinsburg, Weaver's attorney's communications regarding her claims, and communications from Twinsburg's legal counsel regarding Weaver's claims. Weaver and Gaydosh discussed the various councilmen, the Mayor, and "taking down" Mr. Maistros. (*Id*.) These communications all undermine Weaver's claim that she was terminated for "innocently" providing documents to Gaydosh. (*Id*.) In fact, Weaver sent Gaydosh emails about a "spat" between the finance director and City Council members

without being specifically requested to do so. Weaver could not explain why she sent these documents to Gaydosh. Additionally, an e-mail from Councilman Murphy containing a request that the Mayor provide justification for a recent expenditure was forwarded to Gaydosh within minutes of Weaver's receipt of the email. Given the timing of the email, it is impossible for this communication to have been in response to a public records request. (*Id.*)

Accordingly, the record establishes that the Council reasonably relied "on the particularized facts that were before it" when it unanimously decided that Weaver should be terminated. *Smith*, 155 F.3d at 807.[8] The record evidence indicates that Weaver was engaging in improper communications with Gaydosh. Weaver fails to evidence that Twinsburg's articulated reasons for her suspension and ultimate termination were pretext to mask discrimination. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Therefore, Weaver's retaliation claims fail as a matter of law.

---

[8] Although the evidence indicates that at least some of the City Council members were not entirely aware of the scope of Weaver's conduct and that Morris and Maistros were guiding the termination process, it is clear that an investigation was conducted, City Council was apprised of the results of the investigation, and some City Council members asked questions about Weaver's conduct. For example, council member Scaffide indicated that he did not read any of the emails, but after he learned about the emails, he "felt violated by that. [He] felt a mistrust had happened." (R. 39–2 at PageID 920). Weaver clearly used her email in an intentional manner to send information—often without a public records request—to a woman who frequently litigates against the City. Even if Council members were unaware of the exact content of the emails, they clearly believed that Weaver's conduct was improper.

## IV.    CONCLUSION

The district court's grant of summary judgment in favor of the City of Twinsburg is **AFFIRMED**.